short cause, but for the reason, as stated, that it was, under the stat-
ute, entitled to a preference. To obtain such preference, the plain-
tiffs should have served, with the notice of trial, a notice of motion,
and the failure to do so was a waiver of the statutory privilege. No-
tice of an intention to move to place on the preferred calendar on the
ground that it is a short cause is not the equivalent of a notice of mo-
tion for a statutory preference, which should be served with the no-
tice of trial.

The order, accordingly, should be reversed, with $10 costs and dis-
bursements, and the motion denied, without costs.

---

PEOPLE ex rel. McSHANE v. HAGAN et al.

(Supreme Court, Appellate Division, First Department. February 23, 1900.)

ELECTION—RESIDENCE OF ELECTOR—CONSTITUTIONAL LAW.

     Under Const. art. 2, § 3, declaring that no person shall be deemed to
     have gained or lost a residence, by reason of his presence or absence,
     while "kept" in any almshouse or other asylum or institution, wholly or
     partly supported at the public expense or by charity, an "unpaid helper"
     in Bellevue Hospital, who was simply an inmate, with permission to use
     it as an asylum, receiving his board and lodging for the work which he
     was required to do, was "kept" therein, within the meaning of the con-
     stitution, and hence could not gain a residence entitling him to vote in
     the district.

Appeal from special term, New York county.

Proceedings by the people of the state of New York, on relation
of Frank McShane, against James J. Hagan, as warden of the state
prison in the county of New York, and another, on writ of habeas
corpus and certiorari. From an order discharging relator, defend-
ants appeal. Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, McLAUGH-
LIN, PATTERSON, and O'BRIEN, JJ.

John H. Hammond, for appellants.
Nelson Smith, for respondent.

BARRETT, J. The relator was committed by a city magistrate,
to await the action of the grand jury, upon charges of false registra-
tion and illegal voting. The ground of these charges was that he
had not acquired a legal residence in the election district in which
he registered and voted at the general election held on the 7th day
of November, 1899. He was what is known as an "unpaid helper"
in Bellevue Hospital, an institution supported at the public expense,
and he claimed a residence there. The hospital is situated in the elec-
tion district in which he registered and voted, and he had no other
residence in that election district. We have gone over the deposi-
tions, and are of opinion that a prima facie case was made out,
such as to require the submission to the grand jury and a petit jury
of the question of the relator's guilt of the offenses specified in sec-
tions 41a and 41m of the Penal Code. The relator insists that he
was not "kept" in the hospital, within the intent and meaning of
the third section of the second article of the constitution. That sec-
tion reads as follows:

"For the purpose of voting, no person shall be deemed to have gained or lost a residence, by reason of his presence or absence, while employed in the service of the United States; nor while engaged in the navigation of the waters of this state, or of the United States, or of the high seas; nor while a student of any seminary of learning; nor while kept at any almshouse, or other asylum, or institution wholly or partly supported at public expense, or by charity; nor while confined in any public prison."

The question, then, is, was the relator "kept"—that is, supported (Silvey v. Lindsay, 107 N. Y. 60, 13 N. E. 444)—in the hospital? If so, he neither gained nor lost a residence by reason of his presence there while being so kept or supported. The solution of this question depends upon his precise legal status in the hospital. It seems clear that he was "kept" in the institution, within the intent of the constitutional provision, if his presence there was not under some contract, express or implied. Even if his presence there was under a contract, it does not necessarily follow that he thereby acquired residence in the institution. But, if he was simply an inmate of the hospital under a bare license,—that is, with mere permission to use it as an asylum,—then, clearly, he could not gain a residence there while enjoying the maintenance which it afforded him. The testimony leaves no room for doubt that this was the relator's real status. It was sought, by skillful questioning of the witnesses, to obscure this, and to suggest a contract of employment. Thus, the relator was made to talk of "working for his board, lodging, and clothing." So, too, the superintendent, under leading questions, spoke of "paying" these helpers "for their services." All this, however, was but a conclusion from the facts,—a conclusion put in the mouths of willing witnesses. The actual facts, as testified to, were that the superintendent himself had no authority of any kind to employ unpaid help; that consequently he never made, or attempted to make, any contract of employment with the relator; that no one else in the hospital had any authority to make any such contract, and that no one else did. There was a custom by which one Downes, who had charge of the workmen hired from time to time, recommended unpaid helpers to the superintendent, and that the latter would thereupon take them in, if he were so disposed. They were then told that they would get their board and lodging and an occasional suit of dead men's clothes, would be required to work as directed, and would be kept just as long or as short a time as the superintendent pleased. And they would stay, subject to his pleasure, just as long or as short a time as they pleased. This was the sum and substance of it. All else is an attempt to paraphrase the transaction into what it was not. The arrangement was called, in varying phrases, "a chance to earn a living," a "job," "services" payable in board and lodging, and the like; but essentially it was quite the reverse, namely, board and lodging, support, maintenance,—in fact, an asylum at the public expense, with the usual almshouse and municipal lodging house accompaniment of work. Laws 1897, c. 378, § 681; Laws 1886, c. 535, § 5. This is what it comes to, or certainly what a jury would be justified upon the evidence in saying that it comes to. There was not throughout a trace of genuine contract obligation on either side.

We find that upon the election day in question there were 155 of these "unpaid helpers" in this institution, and but 119 regular paid employés. It was in part, at least, to prevent such institutions from being utilized for political purposes that this provision of the constitution was adopted. That provision would be practically nullified were the courts to favor mere devices like the present, whereby it is sought to turn these penniless and homeless inmates into contract employés and genuine residents. Efforts of a similar character in other directions have been numerous, but they have uniformly failed. Silvey v. Lindsay, supra; People v. Cady, 143 N. Y. 100, 37 N. E. 673, 25 L. R. A. 399; In re Goodman, 146 N. Y. 284, 40 N. E. 769; In re Garvey, 147 N. Y. 117, 41 N. E. 439.

It is also apparent that the relator here appreciated his real status in the hospital, and that he never attempted or intended to make it his residence. He was well aware that he could be sent away at any moment, and accordingly, as he himself testified, he did not make up his mind "to stay there any length of time." There was ample evidence to warrant the relator's commitment, and the order appealed from should therefore be reversed, the writs of habeas corpus and certiorari dismissed, and the relator remanded to the custody of the warden of the city prison.

PATTERSON and McLAUGHLIN, JJ., concur. VAN BRUNT, P. J., and O'BRIEN, J., concur in the result, upon the ground that it is a question for a jury to determine whether McShane intended to acquire a residence in the hospital.