(June 6, 1901.)

## POWELL v. SPACKMAN.

### [65 Pac. 503.]

ELECTIONS—CONSTITUTIONAL CONSTRUCTION.—A constitutional provision which provides that "for the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence . . . . while kept at any almshouse or other asylum at public expense," 'preserves the voting status of the inmates of a soldiers' home at the time of their entry thereto, and such inmates cannot acquire, by reason of their presence in such soldiers' home, and while kept at public expense, the right to vote in the county and precinct in which such institution is located.

CONSTITUTIONAL CONSTRUCTION.—Where the language of a constitutional provision is plain and free from ambiguity, the ordinary signification of the words employed, as used in common parlance, must be considered, and the intent of the provision gathered from the words themselves, giving to them their usual meaning and signification.

(Syllabus by the court.)

APPEAL from District Court, Ada County.

Henry Z. Johnson, John J. Blake and Hawley & Puckett, for Appellant.

It will be seen from the agreed facts that the sole question presented for decision in this case involves the right of the inmates of the soldiers' home to gain a residence therein for voting purposes. Appellant insists that the votes cast at said election by the inmates of said institution are illegal and void, and invokes in his behalf the provisions of our constitution, article 6, section 3, which are as follows: "For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of this state or of the United States, nor while engaged in the navigation of the waters of this state, or of the United States nor while a student of any institution of learning nor while kept at any almshouse or other asylum at the public expense." This provision of our constitution is similar to a like one to be found in the constitutions of many states, notably New York, Michigan, Kansas, Pennsylvania and California, in all of which states, except California, it has been held that the inmates of the soldiers' home of those states, respectively, were not entitled to vote in the precinct where the home was located. (*Silvey v. Lindsay,* 107 N. Y. 55, 13 N. E. 444; *Lawrence v. Leidigh,* 58 Kan. 594, 62 Am. St. Rep. 631, 50 Pac. 600; *Wolcott v. Holcomb,* 97 Mich. 361, 56 N. W. 838, 23 L. R. A. 215; *Registration in Erie, Pa., County Court,* Co-op. Dig. 1899, vol. 7, p. 2039; *Matter of Goodman,* 146 N. Y. 284, 287, 40 N. E. 769; *Matter of Garvey,* 147 N. Y. 117, 41 N. E. 439.)

Wyman & Wyman, for Respondent.

Under the common-law rule no one becomes a voter merely "by reason of his presence or absence" at a particular place, independent of any constitutional provision. (*Budd v. Holden,* 28 Cal. 124; *Devlin v. Anderson,* 38 Cal. 92; *Putnam v. Johnson* (1813), 10 Mass. 488; *Biddle v. Wing,* Cl. & H. El. Cas. 504 (an early case in Congress cited in 10 Am. & Eng. Ency. of Law, 2d ed., p. 604); *Bedigo v. Grimes* (1887), 113 Ind. 148,

13 N. E. 700; *Schaffer v. Gilbert,* 73 Md. 66, 71, 20 Atl. 434; *Vanderpool v. O'Hanlon* (1880), 53 Iowa, 246, 36 Am. Rep. 216, 5 N. W. 119; Paine on Elections, sec. 69; *Dennis v. State of Florida* (1879), 17 Fla. 389; *Opinion of Justices* (1843), 5 Met. (Mass.), 587; *Hannon v. Grizzard* (1883), 89 N. C. 115.) Residence in the legal sense is to be determined by the intent and act of the party. He cannot have two homes at once. It is a question of fact, and the intention is evidence of the fact. Mere actual residence, however prolonged, will not constitute legal residence unless accompanied with the intention of making the place a home. (Paine on Elections, sec. 47; McCrary on Elections, 4th ed., sec. 97; Story on Conflict of Laws, p. 44, sec. 46, subds. 7, 8, 13; *Darrah v. Bird,* 3 Or. 229 at 233; 10 Am. & Eng. Ency. of Law, 2d ed., 598, 599.) Section 5, article 6 of the constitution, therefore, merely furnishes a rule of evidence by which their *prima facie* right to vote in and claim as their legal residence the precinct where the home is situated "by reason of their presence" there is taken away, but they must prove their right by other evidence, as was done in this case by evidence showing that they had abandoned their former homes, and made the soldiers' home their actual and permanent residence with the *bona fide* intent so to do," etc., the intent being evidence of the fact. (*Fry's Election Case;* (1872), 71 Pa. St. 302, 10 Am. Rep. 698, quoting Judge King from 1 Ashm. 126; *Vanderpool v. O'Hanlon,* 53 Iowa, 246, 36 Am. Rep. 216, 5 N. W. 119; *Lankford v. Gebhart,* 130 Mo. 633, 51 Am. St. Rep. 585, 31 S. W. 1127; *Darrah v. Bird,* 3 Or. 229; *Wood v. Fitzgerald,* 3 Or. 568; *People v. Holden,* 28 Cal. 124.) Plaintiff merely showing that these persons were inmates of the soldiers' home is no evidence to show that they were not qualified voters. Plaintiff must affirmatively show some other facts from which it could be determined affirmatively that they were illegal voters, as the presumption is that anyone who votes is a legal voter. (*Darrah v. Bird,* 3 Or. 229, 10 Am. & Eng. Ency. of Law, 2d ed., 835c; McCrary on Elections, 4th ed., sec. 466a; *In re Green,* 5 Fed. 145.) The constitution adopted by the state of Idaho in 1890 is taken from the constitution of California, and the decisions

of that court upon what those provisions of the constitution meant were adopted with those provisions. This rule, that "by adopting a statute from a sister state the construction of the statute by the courts of the latter state is also adopted, is a general rule that is universally recognized." (*Flood v. Mc-Clure*, 3 Idaho, 587, 32 Pac. 255; *Brown v. Bryan*, 5 Idaho, 145, 51 Pac. 1001; Sutherland on Statutory Construction, sec. 256, 337.) And this, of course, applies to the constitution, which is but the law by the people, as the statutes are laws enacted by the legislature, and this is particularly true of election laws. (See 10 Am. & Eng. Ency. of Law, 2d ed., subd. 2, p. 588, tit. "Elections.")

QUARLES, C. J.—This action was commenced by the appellant, who is an elector of Ada county, to contest the election of the respondent, Hester M. Spackman, to the office of county superintendent of public instruction of said county, and who received a certificate of election to said office; whereas it is claimed by appellant that Miss Helen Coston was elected to said office, and should have received certificate of election thereto. A stipulation of facts was filed, and the case decided upon the same by the lower court. It is agreed in the stipulation that forty inmates of the soldiers' home, situated in soldiers' home precinct, in said county, voted for Miss Spackman, including which forty votes the votes of Miss Spackman was two thousand two hundred and ninety-nine and that of Miss Coston two thousand two hundred and ninety. It is also stipulated that these forty inmates never resided in said county except in said soldiers' home, the eighth paragraph of the stipulation being in words and figures as follows: "That at least forty of the said persons above referred to, and whose names are set forth in plaintiff's complaint, will testify that they abandoned their former residences and places of abode with no intention of returning thereto, and took up their residence in said soldiers' home in said soldiers' home precinct, Ada county, Idaho, and thereafter resided and continued to reside therein with the intention of permanently remaining and residing there; and that each of said persons were, at the time of said election, and for six months prior thereto had been, residing at

and as inmates of the soldiers' home in said Ada county, state of Idaho; and that at all times during their residence there the said soldiers' home was established under the laws of the state of Idaho, and maintained at the public expense. That all of said persons above referred to were duly and regularly admitted to said soldiers' home under the terms and provisions of the act entitled 'An act to establish a soldiers' home,' passed at the second and fifth sessions of the legislature of the state of Idaho, and approved March 2, 1893 [Sess. Laws 1893, p. 91], and February 9, 1899 [Sess. Laws 1899, p. 190], respectively, and hereinbefore referred to; and during all the time of their residence in said Ada county they were maintained in the said soldiers' home at the public expense." Judgment was given in favor of Miss Spackman, the respondent, from which judgment this appeal was taken.

This cause is to be determined upon a construction of article 6 of our constitution, especially section 5 of said article, which is as follows: "For the purpose of voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the state, or of the United States, nor while engaged in the navigation of the waters of this state or of the United States, nor while a student of any institution of learning, nor while kept at any almshouse or other asylum at public expense." Section 2 of said article of the constitution, as amended; provides that: "Except as in this article otherwise provided, every male and female citizen of the United States, twenty-one years old, who has actually resided in this state or territory for six months, and in the county where he offers to vote thirty days next preceding the election, if registered as provided by law; is a qualified voter." Section 3 of said article provides that parties who are insane, under guardianship, idiotic, convicted of any of certain crimes, and not restored to citizenship, or who, at the time of the election, is confined in any public prison, etc., shall not vote. Section 4 of said article is as follows: "The legislature may prescribe qualifications, limitations and conditions for the right of suffrage additional to those prescribed in this article, but shall never annul any of the provisions in this

article contained." The election statutes of this state cannot affect the question presented here, as none of the constitutional provisions can be repealed by legislative enactment. It will thus be seen that the qualifications of an elector are prescribed by the constitution; that the legislature is restricted from annulling any of the qualifications prescribed, but expressly authorized to prescribe additional "qualifications, limitations, and conditions for the right of suffrage." One of the indispensable elements of the right to vote in this state is residence —"six months in the state, and thirty days in the county, next preceding the election"—and so says the constitution. Can this residence be acquired by a person who is an inmate of an almshouse or of an asylum kept at public expense, while residing in such almshouse or asylum? The answer to this must be found in a construction of the language used in section 5, article 6, of the constitution, quoted above. This section must be considered in connection with the other provisions of the constitution, and the whole must be construed so as to give force and effect to all of the provisions of that instrument, without destroying or nullifying any of them. The meaning and intent of the provision in question, taking the instrument as a whole, must be determined. In doing this we must give to the language used that effect which was most probably intended. We must consider the words used in their ordinary and usual signification.

It will be seen that the specific inquiry here is whether a resident of some county other than Ada county can take up his abode in the soldiers' home, in soldiers' home precinct, in Ada county, intending to make that his home permanently, and with the intention of abandoning his former residence, and by continuous presence in said soldiers' home for thirty days (he having been in the state six months prior thereto), acquire the right to vote in said precinct. The stipulation of facts in this case shows that the votes in question were cast by inmates of the soldiers' home, who, "during all the time of their residence in Ada county, . . . . were maintained in the said soldiers' home at the public expense." With all due deference to the inmates of said soldier's home, there can be no question but what it is an

"asylum," maintained "at the public expense." Now, in the purview of the constitutional provision under consideration, what does the language used mean: "For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence . . . . while kept at any almshouse or other asylum at the public expense"? In interpreting this language we should have no serious trouble, as all the words used are simple, and have a well-defined signification as used in common parlance. If any one word in this section is liable to raise any doubt whatever of the meaning of the provision, or the effect that it was intended that the provision should have, it is the word "deemed," in the phrase "no person shall be deemed to have gained or lost a residence by reason of his presence or absence," etc. The word "deemed" is the past participle of the transitive verb "deem," which is defined by Webster as follows: "To account; to esteem; to think; to judge; to hold in opinion; to regard." And it is defined by the same lexicographer, when used as an intransitive verb, as follows: "To be of opinion; to think; to estimate." Giving this word its ordinary signification as generally used, it would read in the provision in question thus: "No person shall be accounted, or no person shall be esteemed, or no person shall be thought to be, or no person shall be judged to be, or no person shall be held in opinion to be, or no person shall be regarded to have gained or lost a residence by reason of his presence or absence at an asylum kept at the public expense, for the purpose of voting." The right of the forty inmates of the soldiers' home mentioned in the pleadings and stipulation of facts depends, so far as the qualification of residence is concerned, to vote in said Ada county, upon their presence in said soldiers' home. They did reside in other counties. All of their residence in Ada county has consisted of the time spent by them in the soldiers' home; and, if they have resided in Ada county the requisite thirty days required by the constitution in order to entitle them to vote in the latter county, it must be "by reason of their presence" in the soldiers' home. Now, if the court is prohibited from "accounting" them residents of the county of Ada, for voting purposes, "by reason of their pres-

ence" at said home, how can we account them residents of said county? How can we "esteem" them residents of said county? How can we "think" them residents of said county? How can we "judge" them to be residents of said county? How can we "hold in opinion" that they are residents of said county? How can we "regard" them as residents of said county? To do so it must be "by reason of their presence" at the soldiers' home, and while kept at public expense, in plain violation of the constitution. This cannot be done without violating the constitution itself. The language used cannot be regarded in any other light than that the framers of the constitution intended that the inmates of such an institution, whose residence in a county depended upon their "presence" in or at such institution, should not vote in such county; and, further, that by reason of their absence from the county of their residence they should not lose their right to vote in the latter county.

In the case of *Silvey v. Lindsay,* 107 N. Y. 55, 13 N. E. 444, the court of appeals of New York construed a similar provision. The plaintiff in that case had been an inmate of the soldiers' home at Bath six years, and made oath as follows: "I reside in the town of Bath for the reason that I was admitted as an inmate of the New York Soldiers' and Sailors' Home, in this town, by the authorities thereof, in the year 1880, and have remained such inmate from that time to the present, with the intention at all times of making my residence in said institution, so long as I shall be permitted to remain such inmate. . . . . In becoming an inmate of said institution, I intended to change my residence from the city of New York to the fifth election district of said town of Bath." The plaintiff there, so far as intent is concerned, abandoned his residence in the city of New York, and changed it to the town of Bath. Yet the New York court held that his narrative of this intention was only a conclusion from the facts stated. The court said, *inter alia*: "His relations were not with the village, but with the institution, which was situated within its borders. . . . . It follows that he has not lost the right to vote in the place of his legal residence, New York, for the provision of the constitution in question also declares that he shall not lose his resi-

dence by reason of such 'presence' in the 'institution.' As to that city, he is to be regarded as temporarily absent, and his residence as a citizen still therein. We have no doubt that the institution in question is within the purview of the constitutional provision (article 2 section 3) above referred to. It is an asylum supported at the public expense, and its members are within the mischief against which that provision is aimed—the participation of an unconcerned body of men in the control, through the ballot-box, of municipal affairs in whose further conduct they have no interest, and from the mismanagement of which by the officers their ballots might elect they sustain no injury. But the question in each case is still, as it was before the adoption of the constitution, one of domicile or residence, to be decided upon all the circumstances of the case. The provision (article 2, section 3) disqualifies no one; confers no right upon anyone. It simply [note the language] eliminates from those circumstances the fact of the presence in the institution named or included within its terms. It settles the law as to the effect of such presence, and as to which there had before been a difference of opinion, and declares that it does not constitute a test of a right to vote, and is not to be so regarded. The person offering to vote must find the requisite qualifications elsewhere." The able and ingenious counsel for respondent argues that the decision in *Silvey v. Lindsay, supra,* does not support the contention of appellant; that the facts are different; that in that case the plaintiff's abode in the soldiers' and sailors' home was only temporary, transient, and not intended to be permanent; hence the decision there is not applicable here. However strenuous the effort to distinguish between that case and the case at bar may be, it must fail, as there is no distinction, except in theory, between that case and the one at bar. It is true that Silvey said that he entered the home at Bath "with the intention" of making it his "residence" so long as he should "be permitted to remain such inmate," while the stipulation here says that the forty inmates whose votes are questioned entered the home "with the intention of permanently remaining there," and that they had "abandoned their former residences and places of abode with no intention of returning

thereto, and took up their residence in said soldiers' home."
Yet it is apparent that the plaintiff in the Silvey case and the
forty inmates here each entered the home with the same intent,
to wit, with the intent to reside in said home, and make it their
permanent abode, so long as they could do so, or were permitted
to do so.    As a matter of course, all such institutions have their
rules and regulations, and inmates may be discharged for viola-
tions of same; and then the continuance of the institution it-
self is somewhat problematical, depending,  as it does, upon
popular sentiment—an element that is always charged with
more or less uncertainty.    But the New York court expressly
says in the Silvey case that the presence of the inmate in the
home does not constitute a test of a right to vote, and is not
to be so regarded, and that "the person offering to vote must
find the requisite qualifications elsewhere."    Now, suppose we
do, as the New York court in *Silvey v. Lindsay* said must be
done, eliminate the presence of these inmates from the soldiers'
home, and upon what possible hypothesis can it be held that
they are entitled to vote in the precinct in which the home is
situated?    They came from their former homes, in other
counties, to the soldiers' home, and remained in the home
until the election at which it is claimed that they voted
wrongfully.    If they have resided in Ada county the requisite
time (thirty days) to entitle them to vote at said election, it
is solely by reason of their presence in the home.    This pres-
ence, as was said in *Silvey v. Lindsay,* and as the constitutional
provision under consideration clearly intends, is to be elimi-
nated—not regarded—and their qualifications must be sought
elsewhere.    Now, the constitutional provision under considera-
tion does not prohibit inmates of the home, or other asylums
kept at public expense, from changing their places of residence.
They may do so.    But, for the purpose of voting, they shall
not be deemed to have gained or lost a residence by reason of
their presence in the institution, while kept at public expense.
Now, having lived in other counties of the state, and having
come into Ada county to reside at the home, to be there kept
at public expense, and residing nowhere else in the county,
how can we, for the purpose of voting, regard them as "having

gained a residence" in the county by reason of their presence at the home? The constitution does not disfranchise any one. It simply declares what persons, by reason of age, citizenship, and residence may vote. In the provision under consideration no one is disqualified from voting. It is declared, however, in that provision, where the parties therein named shall vote. When it declares that no one, by reason of presence or absence in certain service, or at certain institutions, shall be regarded or deemed to have gained or lost a residence for the "purpose of voting," it is only meant that whoever enters such service or such institution, if he votes while in such service or institution, must do so at the place where he was entitled to vote at the time he entered such service or institution. Any other interpretation of the language of the constitution would do violence to the words used, and would palpably defeat the meaning and intent of the provision under consideration. The rule of liberal construction—such as will give effect to the object of a statute or constitutional provision—applies in this state. This rule has been properly adopted. Yet, claiming to apply this rule, an interpretation or construction is asked in this case which does not effect the object sought to be accomplished, but defeats the same. That object, as was said in the Silvey case, was to prevent the mischief resulting from "the participation of an unconcerned body of men in the control, through the ballot-box, of municipal affairs in whose further conduct they have no interest, and from the mismanagement of which by the officers their ballots might elect they sustain no injury." The construction that we are asked to give this constitutional provision is not a construction, but destruction. It does not carry out the object of the constitutional provision; it does not give force and effect to it; it destroys the provision by defeating and thwarting its object and intent.

The respondent interprets the decision in *Silvey v. Lindsay,* cited *supra,* as holding that one can, if he so intends, by mere residence in an institution like the soldiers' home, and while kept at public expense, gain a residence for the purpose of voting, notwithstanding the constitutional provision under consideration; and cites the decision in the following cases as sus-

taining this interpretation, to wit: *People v. Cady,* 143 N. Y. 100, 37 N. E. 673, 25 L. R. A. 399; *In re Goodman,* 146 N. Y. 284, 40 N. E. 769; *In re Garvey,* 147 N. Y. 117, 41 N. E. 439; *In re Batterman,* 14 Misc. Rep. 213, 35 N. Y. Supp. 593; *In re Griffiths,* 16 Misc. Rep. 128, 38 N. Y. Supp. 953; *People v. Hagan,* 48 App. Div. 203, 62 N. Y. Supp. 816. A study of these decisions is instructive, as well as interesting. In *People v. Cady* the defendant was convicted of illegal registration. The facts were that he had been an inmate of the Tombs prison for about seven years, serving under commitments for sixty days each, for vagrancy, and which he himself procured. He testified that he had made his home at said prison, and intended it as his permanent home. The court held that, for voting purposes, the prison could not be the home of any one confined there; that it is not a place of residence, and not maintained for that purpose. The court affirmed the judgment of conviction. In the Goodman case one Henry W. Bainton, who was a student at the Union Theological Seminary, in the twenty-fifth election district of the twenty-first assembly district of the city of New York, registered in said district. Goodman moved to strike Bainton's name from the registry list on the ground that he was not a resident of said district. In opposition to the motion. Bainton deposed that he went to the seminary for the purpose of obtaining a residence and domicile, that he had no intention of changing his residence, and that he claimed no residence elsewhere. Under the constitutional provision of New York, from which the one here under consideration seems to have been copied, the court held that, for voting purposes, Bainton could not lose his residence by removing to the seminary, "nor gain a new residence in the seminary district by his presence in it as a student." The court said in that case, *inter alia,* that: "Usually—perhaps always—the voting residence remains unchanged until a new residence is actually acquired; but there can be no such acquisition merely by an abode as a student in an institution of learning. Something else beyond the fact, and wholly independent of it, must occur to effect the change. The intention to change is not alone sufficient. It must exist, but must concur with, and be

manifested by, resultant acts, which are independent of the presence as a student in the new locality." In the Garvey case the court, in concluding, said: "We have to say in conclusion that, unless the rule laid down in the Goodman case, and followed in the case at bar, is rigidly enforced, the constitutional provision now construed will be nullified. It may be' urged that the enforcement of this rule will render it well-nigh impossible for a student to establish a residence in a seminary of learning, but the very obvious answer is that the letter and spirit of the constitution contemplate such a result. The sojourn of the student is assumed to be temporary, and the law preserves to him his former residence, notwithstanding his absence therefrom." So said the court of appeals of New York. The cases of Batterman (14 Misc. Rep. 213, 35 N. Y. Supp. 593), and of Griffiths (16 Misc. Rep. 128, 38 N. Y. Supp. 953), are not analogous to the case at bar. The question in those cases was whether a similar provision was retrospective, or prospective only, and the court held that it was prospective only. Those decisions, if rendered by a court of last resort, could have no application to the case at bar. In *People v. Hagan* the question arose whether an inmate of a hospital, who performed certain labor there, was "kept at the public expense." The court, *inter alia,* said: "The question, then, is, Was the relator 'kept' (that is, supported—*Silvey v. Lindsay,* 107 N. Y. 60, 13 N. E. 446) in the hospital? If so, he neither gained nor lost a residence by reason of his presence there while being so kept or supported. . . . . But, if he was simply an inmate of the hospital under a bare license—that is, with mere permission to use it as an asylum—then, clearly, he could not gain a residence there while enjoying the maintenance it afforded him. . . . . It was, in part, at least, to prevent such institutions from being utilized for political purposes, that this provision of the constitution was adopted. That provision would be practically nullified were the courts to favor mere devices like the present, whereby it is sought to turn these penniless and homeless inmates into contract employees and genuine residents. Efforts of a similar character in other directions have been numerous, but they have uniformly failed. (*Silvey v. Lind-*

*say, supra; People v. Cady,* 143 N. Y. 100, 37 N. E. 673, 25
L. R. A. 399; *In re Goodman,* 146 N. Y. 284, 40 N. E. 769;
*In re Garvey,* 147 N. Y. 177, 41 N. E. 439.)" The New York
cases lay down with certainty the rule that under this constitu-
tional provision the presence of the inmate of the soldiers'
home therein must be eliminated—disregarded—in determin-
ing whether he is entitled to vote in the election district or
precinct where the home is situated. Eliminating the presence
of the forty inmates of the soldiers' home whose votes are here
in question, it is palpable that they were not entitled to vote
in the soldiers' home precinct in Ada county at the election
in November, 1900, for the reason that they had not resided
in Ada county the thirty days preceding the election, as is re-
quired by section 2, article 6, of the constitution.

Michigan has, and had prior to the adoption of our constitu-
tion, the same provision under consideration here, which the su-
preme court of that state said was copied from the constitution
of New York. (See *Wolcott v. Holcomb,* 97 Mich. 361, 56 N.
W. 837, 23 L. R. A. 215.) In that case the Michigan court
followed and approved the decision in *Silvey v. Lindsay.* After
quoting from Webster to show the meaning of the term "asy-
lum"—"an institution for the protection or relief of the un-
fortunate"—and demonstrating that a soldiers' home, like the
one in question here, is an asylum, the Michigan court says:
"It follows that one's entry and residence in such an institution
partake of the same character as the institution itself, and are
likewise eleemosynary in character. One entering them cannot,
under the constitution, gain or lose his residence. Inmates of
the home enter it for one purpose only, and the constitution
solemnly and clearly declares that their status as to residence
when they enter must control while they remain there. When
Mr. Carpenter entered the home, he was a legal resident of the
township of Woodstock. He entered the home upon his own
application, solely as a beneficiary, and a resident of that town-
ship, to accept a well-bestowed and deserving charity. He did
not, by this act, lose his residence there, and his intent is
wholly immaterial. To permit his intent to control would re-
sult in the practical annulment of this provision of the constitu-

tion. The mischief intended to be avoided is as apparent in this case as in any. The inmates of the home own no property, pay no local taxes, do no work in or for the municipality, and have no pecuniary interest in its local affairs. In fact, they have no connection with, and stand in no relation to, the local municipal government. They occupy state property, and are exclusively under the control and management of the state." The court, in *Wolcott v. Holcomb,* clearly suggests the reasons for incorporating this provision in the constitution, and points out some of the evils that would result from adopting the construction which respondent insists should be adopted. The court in that case also shows conclusively that the interpretation of the decision in *Silvey v. Lindsay,* asked by respondent here is not the correct one, and should not be adopted.

Kansas has the same constitutional provision that is being considered here, and its supreme court has given to it the same construction that the New York court of appeals and the Michigan supreme court gave to the same provision in the cases above cited and quoted from. The Kansas supreme court, in *Lawrence v. Leidigh,* 58 Kan. 594, 62 Am. St. Rep. 631, 50 Pac. 600, has construed this identical constitutional provision, and held that under it an inmate of a soldiers' home cannot, by presence in such home, acquire the right to vote in the voting district where the home is situated. The opinion in this case is very instructive, and clearly shows that such a home is an asylum (in the language of the court, "place or retreat or shelter") ; that the thirty days' residence next preceding the election in the county where the person offers to vote is not acquired by presence in such an institution; and that the inmates of such institutions are entitled to vote at the place of their residence at the time they leave the same to enter the institution, which residence, for voting purposes, cannot be gained or lost by presence in such institution, whatever the intent of the inmates as to future residence or abandonment of the old residence may be. This case is on all fours with the case at bar. In the stipulation of facts—like the one at bar—it was agreed that "these inmates abandoned their former places of abode with no intention of returning thereto, and took up their

residence at the soldiers' home with the intention of perman-
ently remaining there; such of them as had families removing
them and their household goods and other personal belongings."
We quote from the opinion in the Kansas case, which, so far as
the stipulation of facts is concerned, goes to the full extent of
the stipulation of facts in this case, and further, too, making
even a stronger case for the inmates than the case at bar. The
court then discusses and considers the different decisions, show-
ing that the New York and Michigan courts took the same
view of the proper construction of the provision under con-
sideration as did the Kansas court, saying: "The decisions upon
the precise question are few in number. But three have been
called to our attention. Those of *Wolcott v. Holcomb, supra,*
and *Silvey v. Lindsay,* 107 N. Y. 55, 13 N. E. 444, are to the
same effect as the one we make. That of *Stewart v. Kyser,*
105 Cal. 459, 39 Pac. 19, is in opposition. It also appears, by
records of the United States district court for this district,
which have been called to our attention, that in an unreported
case, entitled *'United States v. Rowdebush,'* being an indictment
for illegally voting at an election for representative in Congress,
a decision similar to that of the supreme court of California
was made upon an agreed statement of facts; but we are con-
strained by what we regard as the true interpretation of the
constitution, derived out of the settled and authoritative mean-
ing of the words used, to follow the New York and Michigan
decisions, and hold that, notwithstanding the abandonment by
the veterans in question of their former places of abode and
their settlement at the soldiers' home with the fixed intention
of remaining there, they cannot acquire a residence at such
home for voting purposes."

In *Stewart v. Kyser,* 105 Cal. 459, 39 Pac. 19, the supreme
court of California has given this constitutional provision a
different construction, without giving any good reason for so
doing. Counsel for respondent argues that we copied or bor-
rowed this provision from California, and are, therefore bound
by the construction placed upon the same by the supreme court
of California, and quotes authority to the effect that when we
adopt a statute or constitutional provision from a sister state

that we adopt the construction of the same placed thereon by such state. This rule is correct so far as constructions placed upon the statute or constitutional provision before its adoption are concerned, but not as to those subsequently made. The California case cited *supra* was decided some five years after we adopted our constitution. More than that, it is apparent to one who will give the necessary study and investigation to the subject, that this state, California, Michigan, and Kansas all adopted the constitutional provision under consideration from the state of New York, and for that reason should follow the construction placed upon the same in *Silvey v. Lindsay, supra,* and other cases decided later by the court of appeals of that state. The decision in *Silvey v. Lindsay* was made in 1887, three years before we adopted the provision under consideration—an additional reason why we should follow the construction given in the decision in that case. But the rule of construction invoked by counsel for respondent was not obeyed, but violated, by the supreme court of California, in *Stewart v. Kyser, supra.* Yet we are asked to follow the decision in the latter case. We should not do so, especially as it would, as held by the New York, Michigan, and Kansas cases cited, "nullify" the constitutional provision under consideration.

A labored effort has been made on behalf of the respondent to distinguish the case at bar from the cases of *Silvey v. Lindsay, Lawrence v. Leidigh,* and *Wolcott v. Holcomb, supra,* by showing that inmates in the New York, Michigan, and Kansas soldiers' homes must, under the provisions of the laws creating them, be indigent, while the inmates of the soldiers' home here need not be, and are not, indigents. But this makes no difference whatever, as the framers of the constitution did not limit the provisions of the section to indigents, but intended it to apply to all inmates of every asylum—place of shelter, refuge, or retreat—kept at public expense, whether such inmates be indigent or not. The language used must be taken in its natural import, given its usual signification as used in common parlance, and the intent gathered from the language used, it being plain and free from ambiguity, and, thus considered, it is susceptible of no other construction or interpreta-

tion, otherwise the framers of the constitution would not have said "while kept at any almshouse or other asylum at public expense." In some of the decisions reveiwed here, courts have spoken of various reasons for adopting the constitutional provision which we are considering; but it is not necessary so to do. The language of the provision being plain, and free from ambiguity, courts, in applying it, have no need to look beyond the provision itself to ascertain the reason for its adoption. It is not the province of the court to set at naught the provisions of a constitution made and adopted by the people—the source of all power in a republic—forsooth in the opinion of the court no good reason existed for adopting the provisions. Courts do not make constitutions. They have no right to unmake them, either in whole or in part. It is the duty of the court to apply and give force to all provisions in the constitution, whether they are, in the opinion of the court, wise or otherwise. (See *Cohn v. Kingsley,* 5 Idaho, 416, 19 Pac. 985.) The construction asked in this case would largely nullify the provisions of section 5, article 6, of our constitution, if it did not unmake that section. This the court has no power to do; and should not, by palpable usurpation of power, overthrow the will of the people as expressed in the constitution.

We are cited to a number of authorities showing the rule as to residence and qualifications of voters at common law, but they have no application here. Those authorities are somewhat conflicting, and under them the right of the inmates of the soldiers' home, whose votes are here questioned, might be doubted. But, as was said by the court in *Silvey v. Lindsay, supra,* the constitutional provision which we are considering was adopted to settle the law as to the effect of the presence of the inmates at the home upon their right to vote, "and as to which there had before been a difference of opinion, and declares that it does not constitute a test of a right to vote, and is not to be so regarded." The object of citing these common-law authorities is to induce this court to hold that the provision in question has no force or effect, and that the right to vote of the inmates is to be determined without reference to this provision; its words, meaning, and intent to the contrary, notwith-

standing. A careful reading of the decisions in *Darragh v. Bird,* 3 Or. 229, and *Wood v. Fitzgerald,* 3 Or. 568, show that these cases are not identical with the case at bar. The provisions there construed are somewhat analogous to the one under consideration here, and the Oregon court followed the decision in *People v. Holden,* 28 Cal. 123. In the latter case the supreme court of California held that a soldier serving in the United States army could, notwithstanding a similar constitutional provision, obtain, for voting purposes, a residence in California while serving in said army, notwithstanding that the court there said "that, in determining the fact of residence, presence or absence in the service of the United States shall not be taken into account; or, in other words, neither presence nor absence in the service of the United States is a condition upon which the fact of residence can be affirmed or denied." Is this not saying, in effect, what the New York court of appeals said in *Silvey v. Lindsay,* that "the presence" of the inmate in the home must be "eliminated" in determining the residence of the inmate for voting purposes? Under the language above quoted from *People v. Holden,* to the effect that presence in the service of the United States cannot be taken into "account" in determining the residence of the one offering to vote, and that the right can neither be "affirmed or denied" upon presence in such service, the right is solely dependent upon the intention of the voter. This conclusion is absurd, and not sustained by authority. It is difficult to see how the California and Oregon courts reached the conclusion announced in these cases. We are told that residence in the county is an essential requisite to vote; that presence in the soldiers' home is not to be considered in determining this residence. This creates a residence without presence in the county—by mere intention—a thing which the constitutional provision under consideration was intended to prevent.

Respondent cites Paine on Elections, sections 47, 69-71, but these sections have no bearing upon the question under consideration. This treatise was written in 1887, and, of course, does not and could not, consider the decisions in *Silvey v. Lindsay, supra, Wolcott v. Holcomb, supra,* or *Lawrence v. Leidigh,*

*supra;* and nothing in this treatise has any special bearing upon the question as to what is the proper construction to give section 5, article 6, of our constitution. And what we have said as to Paine on Elections is also true of McCrary on Elections (third edition), published in 1887, and written before the decision was handed down in *Silvey v. Lindsay, supra.*

There can be no doubt that the constitutional provision under consideration was borrowed by the framers of our constitution from New York, and the framers of our constitution are presumed to have known of the construction placed upon that provision by the New York court of last resort when they adopted it. That construction gives force and effect to the language of the provision, and has due regard for the common meaning of the words employed, while the construction demanded by respondent, and which California has given to it, emasculates the provision, and leaves it impotent, without life or vitality.

Under the construction here given to section 5, article 6, of our state constitution, the conclusion is unavoidable that the forty inmates of the soldiers' home mentioned in the aforesaid stipulation of facts were not voters in the soldiers' home precinct, were not entitled to vote for the respondent for the office of county superintendent of public instruction for Ada county, and that said forty votes were wrongfully credited to and counted for the respondent. Deducting these forty votes from the two thousand, two hundred and ninety-nine votes credited to respondent, leaves her with two thousand two hundred and fifty-nine—less than a majority as between her and her competitor, Miss Helen Coston. Miss Coston received thirty-one legal votes more than the respondent received, and was entitled to a certificate of election, and the judgment demanded in the prayer of plaintiff's complaint should have been made and duly entered in behalf of the plaintiff. The judgment is reversed, and the cause remanded to the district court, with instructions to render and enter judgment in favor of appellant in conformity to the prayer of his complaint. Costs of appeal awarded to the appellant.

STOCKSLAGER, J., Concurring.—My associates in this case have each prepared lengthy opinions, the chief justice agreeing with the contention of appellants, Justice Sullivan with the contention of respondent. They have discussed the authorities cited at length, and from them drawn their conclusions. I have carefully examined all the authorities cited by counsel for the respective parties to this action. It is admitted that the only question before the court is whether the occupants of the soldiers' home in soldiers' home precinct are entitled to vote, and were so entitled to vote at the last general election in said precinct, in this, Ada county. Many authorities have been cited by both appellant and respondent, but, after investigating all of them, I only found four bearing directly on the case at bar. Those are the New York, Michigan, and Kansas cases, cited by appellant, and the California case cited by respondent. The three former cases deal with constitutions almost identical with ours, and all construe them in harmony with appellant's contention; while the California case construes a constitution using almost, if not exactly, the same language of the three former constitutions referred to, and construes theirs in harmony with the contention of respondent. It will be observed that the California court cites no authority, and bases its conclusion on its own construction of its constitution. Two Oregon cases are cited by respondent, but I cannot construe them as contended for by respondent. The New York, Michigan, and Kansas cases are discussed at length by the writers, the New York case being the first, which is cited and approved by the Michigan court. Then follows the Kansas case, decided in 1896, which quotes largely and approvingly the New York and Michigan cases. It is earnestly and ably urged by counsel for respondent that the New York case does not conflict with the contention of respondent in this case, but he admits the Michigan and Kansas cases do. A careful review of the facts in all three cases, coupled with the construction of their constitutions, will disclose that the decisions are directly in conflict with the contention of respondent. As I view it, to hold with the contention of respondent would be directly in opposition to these three

courts, and holding with California, that practically stands alone in its construction of a constitution similar to all of them. I concur with the conclusions reached by Chief Justice Quarles.

SULLIVAN, J., Dissenting.—I am unable to concur in the conclusion reached by the majority of the court. Counsel for appellant contended that under the provisions of section 5 of article 6 of the constitution of this state the inmates of said soldiers' home are prohibited from gaining a residence therein for voting purposes, which section is set forth at length in the opinion of my associates. For an intelligent understanding of this case, reference must be had to the law establishing said soldiers' home. (Sess. Laws 1899, p. 190.) The first section of said act is as follows: "That there shall be established in this state an institution under the name of the soldiers' home, which institution shall be a home for honorably discharged Union soldiers, sailors and marines, who served in the Union armies during the war of the Rebellion, and also for the members of the State National Guard disabled while in the line of duty, and veterans of the Mexican war; provided that before any person is admitted to said home, he shall have been a *bona fide* resident of this state not less than four months prior to making application for admission thereto." The second section makes an appropriation of $25,000 to carry out the provisions of said act. Section 3 sets apart twenty-five thousand acres of state land for the maintenance of said home. Said act provides for the admission to said home of all honorably discharged Union soldiers, sailors and marines who served in the Union armies during the war of the Rebellion, and also for the members of the State National Guard disabled while in the line of duty, and veterans of the Mexican war, provided they have been *bona fide* residents of the state not less than four months prior to making application for admission thereto. Thus each and every of the persons therein named must be admitted to said home on application, whether he be indigent and unable to support himself or not. The twenty-five thousand acres of land set apart by the third section of said act for the maintenance of said home and the repayment to the state

of the $25,000 appropriated by the second section, if sold at the minimum price authorized by the law for its sale, would produce $250,000. It no doubt will bring sufficient to repay the $25,000 and interest to the state, and leave a permanent fund for the support of said home of $225,000, which, if put at six per cent interest, will bring $13,500 per annum for the support of said home, which is much more than is required at the present time, as shown by the last report of the superintendent thereof. The general government also appropriates $100 per annum for the support of each inmate of said home. It is also shown by the report above mentioned that the total expense or cost for the support of each inmate for the year of 1900 was about $135. I make this statement to show that the continuance of said home is not problematical or uncertain, but to show that said home is as permanent as are the homes of most of the voters in this state; and also to show that said home was not intended as a temporary home or residence for its inmates, but as a permanent one. All who come within the provisions of said act must be admitted to said home on proper application, whether they be indigent or not, and may remain there as long as they live. It is optional with them, and is not left with the board of trustees to turn them out at its will, as it is under the laws of other states governing homes established in those states for "indigent and pauper" soldiers and sailors. For a right decision of this case the character of this home must be kept in mind. The inmates are not there for temporary purposes, subject to the will of others, but may remain there permanently, if they desire to do so, and conduct themselves as gentlemen. It is conceded that the sole question presented for decision in this case involves the right of the inmates of the soldiers' home to gain a residence therein for voting purposes. It is contended by counsel for appellant that such inmates are absolutely prohibited from gaining such residence by the provisions of said section 5, article 6, of the constitution of Idaho. In support of that contention they cite *Silvey v. Lindsay*, 107 N. Y. 55, 13 N. E. 444; *Lawrence v. Leidigh*, 58 Kan. 594, 62 Am. St. Rep. 631; 50 Pac. 600; *Wolcott v. Holcomb*, 97 Mich. 361, 56 N. W. 837, 23 L. R. A. 215; *Regis-*

*tration in Erie, Pa., County Court* Co-op. Dig. 1899, vol. 7, p. 2039.   The first three cases cited arose under provisions of the constitutions of three respective states similar to the provisions of said section 5 of our constitution, except, however, that the section in those state constitutions contained the clause, to wit, "nor while confined in any public prison."   Section 3 of said article 6 of our constitution prohibits certain persons from voting, and includes those "confined in prison on conviction of a criminal offense."   The laws establishing the soldiers' homes in New York, Michigan, and Kansas are quite different from that establishing the soldiers' home in Idaho. They provide only for the admission of disabled indigent and pauper soldiers and sailors—those who are dependent upon charity for their support; and they must be discharged or turned out as soon as they become self-supporting.   Inmates of those homes were admitted for temporary purposes only, and could not acquire a permanent domicile or residence therein. In *Silvey v. Lindsay, supra,* the court said: "The intending voter was in Bath [the town where said home was situated] as a mere inmate of the institution, and for temporary purposes"; and held that he was not a legal voter, and say; "But the question in each case is still, as it was before the adoption of the constitution, one of domicile or residence, to be decided upon all the circumstances of the case."   Why did that court there say that each case must be decided upon all of the circumstances of the case, if it intended to hold that the one fact that being an inmate of such institution prohibited such inmate from gaining a voting residence?   The case of *Wolcott v. Holcomb, supra,* quotes largely from the opinion in *Silvey v. Lindsay.*   The law that established the soldiers' home of Michigan and the rules and regulations adopted for its government show that it was a poor house for pauper soldiers and sailors, and the decision in that case clearly indicates that the court so held.   It is stated on page 367, 97 Mich., page 839, 56 N. W., page 218, 23 L. R. A., as follows: "If the construction [of the provision of the constitution under consideration] contended for by the relator be correct, it follows that all of the inmates of county almshouses and of prisons and jails are

electors, at their option, in the townships and cities where those institutions are located." The matter stated in that quotation from the Michigan case no doubt had a controlling influence in the decision of it. As is stated on page 364, 97 Mich., page 838, 56 N. W., and page 217, 23 L. R. A., as follows: "The mischief intended to be avoided is as apparent in this case as in any. The inmates of the home own no property, pay no local taxes, do not work in or for the benefit of the municipality, and have no pecuniary interest in its local affairs. In fact, they have no connection with it, and stand in no relation to the local municipal government." Thus it is shown that that case is very different from the one at bar. The inmates of the Idaho Soldiers' Home may, and, so far as the record shows, do, own property, pay local taxes, do work in and for the benefit of the municipality, and have a pecuniary interest in its local affairs. The constitution of Michigan has no prohibited classes as we have in said section 3, article 6, of our constitution. That fact, no doubt, had its influence on the mind of the supreme court in the rendition of said opinion, or, at least, on the minds of the majority of the court, as that opinion was by a divided court (three to two), as Chief Justice Hooker wrote a dissenting opinion, in which Mr. Justice Long concurred. In reply to that statement in the opinion of the majority of said court wherein it is suggested that the inmates of said home own no property, pay no taxes, and do no work for the benefit of the municipality, the chief justice, in his dissenting opinion, very cogently remarks that, "it never has been a requisite to electoral rights that the citizen should pay taxes, do work for the benefit of the municipality, or evince interest in municipal affairs; nor does the right depend upon a wise or even honest exercise of the privilege of the ballot"; that "this proposition is so important a part of the foundation of our institutions that it should not be eliminated or weakened by any unnecessary construction of a constitution based upon civil and political equality"; and that "the true construction of this section should be just what its language imports —i. e., that being kept in an almshouse, or attendance at a college, or employment in the service of the United States,

or the navigation of the lakes or high seas, does not work a change of residence against the intention or desire of the individual." If it be a necessary qualification to vote that one owns property, pays taxes, and does work for the benefit of the municipality, no doubt thousands in this state would be disqualified from voting. If that was a reason for adopting said constitutional provision, it ought to apply to all alike, and not alone to the student, soldier, and old veteran.

What we have said in regard to the case of *Wolcott v. Holcomb* substantially applies to the case of *Lawrence v. Leidigh, supra,* and the court apparently rests its opinion upon the New York and Michigan cases, *supra,* and the further fact that the law establishing the soldiers' home in Kansas, provided in direct terms that inmates of said homes could not acquire a legal residence while inmates of said home. In *Warren v. Board,* 72 Mich. 398, 40 N. W. 553, Justice Campbell, after quoting section 5 of article 7 of the constitution of that state, which is the same, so far as the question under consideration is concerned, as said section 5, article 6, of the Idaho constitution, says: "These provisions do not prevent such persons from becoming residents, if such is their purpose, and if they are able to choose." One class of persons named in said section of the Michigan constitution was those confined in public prisons. They were not "able to choose." That court held that all of the classes named in said section that were able to choose were not prohibited by the provisions of said section from becoming residents for voting purposes.

The case of *Stewart v. Kyser,* 105 Cal. 459, 39 Pac. 19, is a soldiers' home case, is directly in point, and sustains the contention of respondent. In that case, a number of the inmates of the veterans' home, and inmates of the county infirmary, and certain students of Napa College voted at an election held in the precincts of the county in which those institutions are situated. The appellant contended that such inmates and students had not been residents of the county and precincts in which they respectively voted during the period of thirty days immediately prior to said election, and for that reason were not qualified electors. The testimony of one of

the inmates of the veterans' home is quoted in said opinion, and it is stated in the opinion that the evidence of said witness upon the issue as to the qualifications of said witness is substantially a fair sample of that applicable to each of the other inmates of the veterans' home, the infirmary, and the college, whose votes were adjudged to have been legal. Said evidence is as follows: Killalee came to the county and to the precinct and entered the home as an inmate on November 14, 1891. For some time prior to this date he was living on the charity of relatives and friends in the city and county of San Francisco, where he was an elector. He made and subscribed the usual application, and obtained a permit to enter the home. He says that: "The reason I went there was because I was in indigent circumstances. Circumstances compelled me to go, and I would not have gone there had it not been for those circumstances. I had no desire to become a resident of the veterans' home or the precinct other than as induced by my indigent circumstances. Since I have been there, I have been maintained and supported by the home. At the time I went there, I did not have any fixed intention with respect to the length of time I should stay there. It was my intention to stop there as long as I lived. I have no other interests in the precinct except my relations with the home. I went there with the expectation of living and dying there—making it my permanent home the balance of my life. I have no relatives or property interest in the veterans' home precinct. I have no other home. At the time I went there, it was my intention to make the home my permanent home. I make it as a home to live and die—as a refuge." The question presented in that case was whether or not said witness "Killalee was a legal resident of the veterans' home precinct, and entitled to vote at the last general election." It was conceded in that case, as in the case at bar, that said witness had all of the requisite qualifications of an elector, except that of residence; and it was contended there, as here, that said witness could not gain a residence for the purpose of voting at the soldiers' home, while there, as a beneficiary at public expense, for the reason that the gaining of such is prohibited by the fourth

section of the second article of the constitution of that state, which is as follows: "For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, nor while engaged in the navigation of the waters of this state, or of the United States, or of the high seas; nor while a student at any seminary of learning; nor while kept at any almshouse or other asylum at public expense; nor while confined in any public prison." In reference to that section of the California constitution, that court said: "As construed by our supreme court in the case of *People v. Holden,* 28 Cal. 137, this section does not have the effect claimed for it by counsel for appellant. In that case, the qualification of soldiers to vote while employed in the service of the United States was questioned, and it was decided that their presence in Mendocino county, while thus employed in the service of the United States did not 'preclude them from acquiring a residence in Mendocino, if disposed to do so.' The court further said: 'That it was their intention to acquire a domicile in Mendocino county sufficiently appears from the evidence. Such being the case, there is nothing in the constitutional provision in question (which is merely declaratory of the common law) which stands in the way of their doing so.' " After quoting the above from the decision of *People v. Holden,* the court says: "Thus their residence, for the purpose of voting in Mendocino county, was made to depend upon the proof of their intention to make that county their place of residence while there present in the service of the United States, there being no question that they had all other requisite qualifications of electors"; and holds that said decision is clearly in point for respondents. The provisions of the California constitution under which said case arose are identical with our own upon the point under consideration, and the court, in that opinion, construed said provisions, and gave them the effect intended, to wit, they were adopted for the benefit of, and to enlarge and protect the rights of, those classes, and were not intended to deprive them of a privilege so common in this country. To the same effect is *Pedigo v.*

*Grimes,* 113 Ind. 148, 13 N. E. 700. That case involved the right of a student attending college to vote. The court said: "Taking the view of the testimony most favorable to the appellant, the utmost that can be said of it is that the voters entered the state university at Bloomington without, at the time of entering, having formed a definite intention of making that place their residence, but that they did subsequently determine that it should be their residence. This gave them the right to vote, because there is no evidence that this was not their intention, formed and acted upon in good faith. We think it clear that, if they had gone to Bloomington with the intention of remaining simply as students, and there was no change of intention, they would not have acquired a residence." Several authorities are then cited, and the opinion proceeds: "Where, however, the intention is formed to make the college town the place of residence, and that place is selected as a domicile, when the person has done this in good faith, he becomes a qualified voter." Apply the correct and reasonable rule there laid down to the case at bar, and the plain intention of the provisions of said section 5 of our constitution is effected and accomplished, and no one disfranchised by a court-made constitutional provision. In the case at bar it is agreed that each of the persons whose vote is questioned would testify "that they abandoned their former residences and places of abode with no intention of returning thereto, and took up their residence in said soldiers' home precinct, Ada county, Idaho, and thereafter resided and continued to reside therein with the intention of permanently remaining and residing there." Thus it is shown that said persons abandoned their former residence and place of abode without any "intention of returning there, and took up their residence in said soldiers' home precinct with the intention of permanently remaining and residing in said precinct"; not to be turned out as soon as their physical or financial condition permitted, as the laws of the states of Michigan and Kansas required to be done in those states. The good faith and intention of said persons is not questioned, but it is contended that they cannot gain a residence in said precinct while an inmate of said home. Apply to the

above facts—which clearly show intention—the reasonable rule laid down in the Indiana case above cited, and the brave old veterans, whose heroism and self-sacrifice assisted in preserving the unity of the nation, will not be disfranchised by court-made constitutional provisions.

In *Shaeffer v. Gilbert,* 73 Md. 66, 20 Atl. 434, which is a college student case, the court, in passing upon the meaning of the word "residence," as used in the constitution of Maryland, says: "It does not mean, as we have said, one's permanent place of abode, where he intends to live all his days, or for an indefinite or unlimited time; nor does it mean one's residence for a temporary purpose; . . . . but means, as we understand it, one's actual home in the sense of having no other home, whether he intends to reside there permanently or for a definite or indefinite length of time"; and hold, under the facts of that case, the defendant had a right to vote. In *Vanderpoel v. O'Hanlon,* 53 Iowa, 246, 36 Am. Rep. 216, 5 N. W. 119—a college student case—it is held that, to constitute a residence within the meaning of the article of the constitution prescribing qualifications of voters, the fact of residence and the intent to remain must concur. Both of which concur in the case at bar. In section 69 of Paine on Elections, referring to college students, the author says: "The question of residence is to be determined by all the circumstances of each case. Among such circumstances, the intent of the party, the existence or absence of other ties or interests elsewhere, the dwelling place of the parents, or, in the case of an orphan, just of age, of near friends, with whom he had been accustomed to make his home in his minority, would, of course, be of the highest importance." And in section 70 it is said: "Under a constitution declaring that the residence of a student at any seminary of learning shall not entitle him to the right of suffrage in the town in which such seminary is situated, while such residence will not entitle him to the right, it will not prevent its acquisition." So in the case at bar, under the provisions of said section 5 of our constitution, which is that, for the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while residing at the soldiers' home, the

mere fact of such residence will not, of itself, entitle him to the right to vote. Such residence, however, will not prevent the acquisition of such right. In McCrary on Elections, third edition, section 66, it is stated as follows: "It will be found, from an examination of the authorities, and from a full consideration of the subject, that the question whether or not a student at college is a *bona fide* resident of the place where the college is located must in each case depend upon the facts, etc. In a word, it is necessary, from a survey of all the facts, to determine whether while at college he is at home, his residence, or temporarily absent from it." It was laid down in *Putnam v. Johnson,* 10 Mass. 488, in 1813, that the question of residence was one of act and intention as applied to college students, and is still so held by the decided weight of authority; and college students, under section 5 of our constitution, are placed in the same category with inmates of our soldiers' home. And said section leaves it with that class of persons to retain the former home as a voting place, or permits them to adopt their present home for that purpose. To the same effect is *Opinion of the Justices,* 5 Met. (Mass.) 587. In *Re Green* (C. C.), 5 Fed. 145, it is held under the provisions in the constitution of the state of New York, in order to prove a residence in an election district something more must be shown than the fact of having lived in marine barracks located within the limits of such district in the capacity of a marine. Many of the cases hold that something more must be shown than mere residence at such home; but none of the cases cited, as I read them, hold that residence at such a home is a prohibition against the inmate gaining a voting residence while residing there, except *Wolcott v. Holcomb* and *Lawrence v. Leidigh, supra.*

It is said in *Silvey v. Lindsay:* "But the question in each case is still, as it was before the adoption of the constitution, one of domicile or residence, to be decided upon all of the circumstances of the case." The common-law rule disqualified those who were indigent or under the dominion of others, which rule embraces many of those disqualified under section 3, article 6, of our state constitution. (1 Blackstone's Com-

mentaries, Cooley's ed., side p. 171.)    Under the common-law
rule no one became an elector merely by reason of his presence
or absence at a certain place.    It rquired something besides
mere presence.    It required other circumstances; it required
intent; it required good faith.    The residence must not be for
temporary purposes.    It must be one's actual home in the
sense that he has no other home; no place to return to when
away, but that one; abandonment of former home.    Those are
some of the facts to be shown to prove intent and good faith
in establishing a residence, all of which are shown by the
record in this case.    The question of residence, as applied to
electors, is one of act and intent, as laid down by a long line
of decisions of courts and law-writers; and that rule has not
been changed by the provisions of said section 5 of our consti-
tution.    In the case of *People v. Cady,* 143 N. Y. 100, 37 N.
E. 673, 25 L. R. A. 399, the question was presented whether a
prisoner imprisoned in the Tombs city prison could gain a
residence therein for voting purposes.    The court held that he
could not; that the Tombs was not a place of residence; it was
not constructed or maintained for that purpose.    The court
says: "The domicile or home requisite as a qualification for
voting purposes means a residence which the voter voluntarily
chooses and has a right to take as such, and which he is at
liberty to leave, as interest or caprice may dictate, but without
any present intention to change it."
    It has been suggested that the fifth section of article 6 of the
constitution of Idaho was adopted from the constitution of
New York, and that in adopting that provision we adopted the
construction placed upon it in *Silvey v. Lindsay, supra,* by the
court of last resort of that state.    I have followed that rule as
I read that decision, but, if I have not construed it according
to its true intent and meaning, I would say, as this court has
heretofore said, that the rule referred to is a general rule, but,
where such decision places a construction thereon that is clearly
erroneous, iniquitous, and unjust, this court is not bound by
said rule, and ought not to be bound by such construction.
Had the framers of our constitution intended, by the provisions
of said section 5, to prohibit inmates admitted from other
counties from voting in the county where the home is located,

why did not they use plain and simple language to that effect? I have no doubt that they would have done so had they intended to prohibit such persons from voting. The language used in said section 5 is too plain to be misunderstood, and, to construe it to prohibit such inmates as the forty referred to in this case from voting, the prohibition must be read into it, for it is not there as the section now stands. It was said by the supreme court of Oregon, in the case of *Darragh v. Bird,* 3 Or. 239, after quoting section 4, article 2, of the constitution of Oregon, which is as follows: "For the purpose of voting no person shall be deemed to have gained a residence by reason of his presence or absence while employed in the service of the United States or of this state," and section 5 of the same article: "The question of residence being one of act and intention, the framers of the constitution left the matter entirely to the discretion of the parties themselves." If the contention of appellants is right, the fifth section of the constitution of Oregon was a work of supererogation, as it positively prohibits soldiers quartered in that state from voting there; and section 4 of said article, so far as the pretended prohibition is concerned, contains the exact words of section 5 of the Idaho constitution. The people, by adopting that provision of the constitution, left the question of residence, where it was before, entirely to the discretion of the parties themselves—that question being one of act and intention; and said: "We will neither enlarge nor restrict the right of persons in this respect, but leave it with them to elect as to where they will claim their residence." The words, "for the purpose of voting," etc., clearly indicate that the matter was left with the elector himself to select the place of his residence. The section of our constitution under consideration prohibits anyone from questioning the right of the persons therein named from voting at the place from whence they were admitted to such home, but it does not prohibit them from changing their residence therefrom for voting purposes. The constitution of Idaho prescribes the qualifications of an elector, and authorizes the legislature to prescribe other qualifications if it desires to do so. And the language of *Wolcott v. Holcomb, supra,* is quoted

with approval as a reason for the adoption of said section 5 of article 6 of our constitution, to wit, "that the inmates do not own property, do not pay taxes, and do not work for the benefit of the municipality." We would suggest that, had the framers of the constitution desired to prohibit the classes of persons named in said section from acquiring a residence, why was not plain and simple language to that effect used? It is not the province of this court to make any additional qualifications to those provided by the constitution and legislative enactment. The right of suffrage is considered a sacred privilege, and it was plainly the intention of the framers of our constitution to extend that right to all persons except those excluded therefrom by its strict terms. And, if this court has due regard for the rights of the citizen, it will not disfranchise him, or so construe the constitution as to effect his disfranchisement, unless by its strict terms it is clearly required.

Where a constitutional provision is susceptible of two constructions, that construction should be adopted which will protect and save the right of suffrage to the citizen; and the decided weight of authority sustains the construction herein placed upon said constitutional provision. As our government is based upon civil liberty and political equality and the right of suffrage being one of its foundation stones, no person should be disfranchised by construction of the provisions of our constitution which provisions may reasonably be construed in favor of suffrage. Are those old veterans an undesirable and ignorant class in whose hand the ballot ought not to be placed? We think not. But my brothers say their construction of said section of our constitution does not disfranchise them. I admit that it does not in terms, but in effect it does; for, by reason of wounds received in battle, disease, and old age, many of them are unable to return to the counties from whence they entered said home to vote, and they are as effectually disfranchised as though it were held that they could not vote at all. It was held in the California, Oregon, Iowa, and other cases above cited, under constitutional provisions the same as our own, that, the question of residence being one of act and intention, the framers of our constitution left the matter entirely to the

Points decided.

discretion of the parties themselves. That provision of our constitution is merely declaratory of the common law, and does not stand in the way of an inmate of said home acquiring therein a residence for voting purposes. It was made to protect his right to vote, and not to disfranchise him, and it ought to be so construed. While residing at the soldiers' home, those old veterans are not temporarily absent from home. They are at home. They are there to remain, with the right to remain permanently. They have abandoned the place from whence they came without any intention of returning, and have established their permanent residence at said home in good faith. They had a right to do those things. They had a right to choose, and did those acts voluntarily. They may remain there till death, or leave that home whenever they choose to do so. They are not under the dominion of others, as persons who are in prison or in almshouses subject to the absolute will of others, as was the condition of those persons referred to in the New York, Michigan, and Kansas cases above cited. The residence of the old veterans at said home is their permanent place of abode, as permanent as the residence of thousands of the voters in this state, and is a sufficient residence on which to base the qualifications to vote. The judgment of the court below ought to be affirmed.