THE STATE, EX REL. FRANCIS DAVIS, COMMISSIONER OF PUBLIC LANDS AND BUILDINGS, BRUNO TZSCHUCK, SECRETARY OF STATE, GEORGE H. ROBERTS, ATTORNEY GENERAL, AND J. C. MCBRIDE, STATE TREASURER, V. SAMUEL BACON.

1. **Board of public lands and buildings.** The state board of public lands and buildings have not, under the provisions of the constitution, or the act of February 13, 1877, authority to appoint and remove officers of state institutions.

2. **Mandamus.** Action by mandamus will lie to compel an officer to deliver up property of the state, held by him without any right or authority at law.

3. **Institution for the Blind.** The institution for the blind is not, within the meaning of section 19, Art. V, of the constitution, an educational institution, and therefore is within the control of the board of public lands and buildings. GANTT, J., *dissenting*.

ORIGINAL application for mandamus.

*George H. Roberts*, Attorney General, *J. C. Watson and Frank P. Ireland*, for plaintiffs.

*Covell & Ransom and M. L. Hayward* for respondent.

GANTT, J.

An institution for the education of blind persons in this state was established by act of February 19, 1875. The provisions of this act placed the institution under the general supervision of a board of trustees, who are authorized and empowered to adopt rules for the government thereof, provide teachers and assistant officers, and to perform all necessary acts to carry out the purposes of the institution.    Under the provisions of this act, the legislature selected trustees, who appointed the defendant principal of the institution, which has been conducted according to the design of the establishment. By act of February 13, 1877, the legislature defined the powers and duties of the board of public lands and buildings of the state, created by section nineteen, article five of the constitution.    The plaintiffs in this action constitute such board, and have assumed the supervision and control of the institution in question, and claim that they are "custodians of the buildings and premises," and have the legal right to the "general supervision and control of such institution;" and allege that they have removed the defendant from the office of principal thereof, and that he refuses to turn over to them the buildings, grounds, and all records, books, papers, and furniture appertaining to said institution, and therefore pray for a writ of mandamus compelling him to forthwith deliver up to them all said property.    Under the pleadings and evidence two questions are presented for the consideration of the court: *First*, has the state board of public lands and buildings the power to appoint and remove officers of state institutions properly under their supervision and control? and *Second*, does the institution for education of blind persons come within the exception of section nineteen, article five of the constitution?

In the consideration of these questions it may be observed in the first place, that, in the construction of a constitution the rule is, "its terms must be taken in the ordinary and common acceptation, because they are supposed to have been so understood by the framers and by the people who adopted it. This is unquestionably the correct rule of interpretation. It, unlike the acts of our legislature, owes its whole force and authority to its ratification by the people; and they judged it by the meaning apparent on its face according to the general use of the words employed, when they do not appear to have been used in a legal or technical sense." Sedg. stat. and const. law 413. It is, then, according to this rule of interpretation that the right of the plaintiffs to exercise the power they claim must be determined. They claim authority primarily under section nineteen, article five of the constitution, which provides that " the commissioner of public lands and buildings, the secretary of state, treasurer, and attorney general, shall form a board, which shall have general supervision and control of all the buildings, grounds, and lands of the state, state prison, asylums, and all other institutions thereof, except those for educational purposes; and shall perform such duties and be subject to such rules and regulations as may be prescribed by law." Now this section must be judged by the meaning apparent on its face according to the general use of the words employed; and it is plain that the words employed do not vest the board with power to appoint and remove any officer of a state institution. It is in this respect wholly silent, and certainly the court cannot invest the board with such power. To do so the court must arrogate to itself the authority to frame and adopt constitutional provisions for the people, while, on the contrary, a constitution owes its whole force and authority to its ratification by the people. Hence, we are of opinion that the authority to appoint and remove

officers of state institutions cannot be derived from the constitution. It is, however, quite clear that under the latter clause of the section, the legislature may define the duties of the board and prescribe the rules and regulations by which they shall be governed.

Then does the act of February 13, 1877, relative to the duties of the board, confer on them the authority now claimed? It provides that the board " shall have general custody and charge of all buildings and institutions and the grounds thereto, coming under the provisions of this act, to direct the general management of all said institutions * * * and shall have reviewing power over the acts of the officers of such institutions;" and then by section seven it provides that " it shall be the duty of the board to take cognizance of all charges and complaints made against said public officers, and at a regular meeting to give an impartial hearing to such charges, and the defense against the same, if any, and report the charges, evidence, and their conclusions in the matter to the governor within six days after the determination of such investigation." This is the extent of the power given to the board over the officers of such institutions, and it certainly falls far short of vesting them with power to appoint and remove officers of such institutions; and such power cannot be implied from the language of the act—on the contrary, such implication of power is indeed clearly repelled by section seven, which requires the board, after such investigation, to report the charge against such officers, together with the evidence taken and their conclusion in the matter, to the governor. It is also repelled by laws enacted prior to the creation of the board, still in force, and not repugnant to any of the provisions of the act of February 13, 1877. By these former statutes the governor alone is authorized to appoint and remove the warden of the penitentiary, and also the superintendent and assistant

physician of the hospital for the insane.   The legislature has not deemed it proper to take from the governor the appointment and removal of these officers.   It therefore seems clear that under our laws, as they now exist, the board has not the power to appoint or remove officers of state institutions.

The second question is:   Does the institution for the education of blind persons come within the exception of section nineteen, article V, of the constitution?   This section gives to the board the supervision and control of the "buildings, grounds, and lands of the state, state prison, asylums, and all other institutions thereof, *except those for educational purposes.*"   The first section of the act of February 13, 1877, is substantially the same in effect.   Now if the institution in question is merely an asylum and not designed for educational purposes, then according to the provision of the constitution it must come under the supervision of the board of public lands and buildings; but if it is designed for educational purposes then it comes within the exception, and is excluded from the supervision of the board.

It is, however, contended that the institute is an asylum; but what is an asylum?   It is defined to be a place where persons flee for protection.   Under the Mosaic Dispensation cities of refuge were set apart to which the slayer might flee so that innocent blood should not be shed, in case the person was not worthy of death—that is, in case the act was accidental and not malicious.   But among the ancients, outside of the Jews, it seems that temples, statues to the gods, and altars particularly consecrated for such purposes, constituted such places of refuge for persons generally, and it was deemed an act of impiety to remove forcibly one who had fled to such an asylum for protection.   However, Tiberius abolished all asylums except the temples of Juno and Æsculapius. These asylums finally passed over to the Christian world,

and under Constantine the Great, all Christian Churches were made asylums for all those who were pursued by officers of justice or the violence of their enemies, and the younger Theodosius, in the year 431, extended these privileges to all courts, gardens, walks, and houses belonging to the church. In the year 631 the Synod of Toledo extended the limits of asylums thirty paces from every church, and this privilege afterwards prevailed in Catholic countries; and it is said to have been a strong armor of defense against the wild spirit of the middle ages, and not without good consequences at the time when force often prevailed against justice. But in later periods of time as other and better systems of procedure in the administration of justice became adopted, asylums were abolished in most countries.

Such then seems to have been the origin, nature, and object of asylums, and such the common acceptation of the term; but more recently, in some countries, the name has been given to institutions for the protection and care of the poor, blind, deaf and dumb, and lunatics who are incapable of taking care of themselves. 1 Encyclopædia Americana, 439. Hence the word asylum having always had a common and well understood signification, our best lexicographers define it to mean " a sanctuary or place of refuge and protection where criminals and debtors found shelter, and from which they could not be taken without sacrilege; an institution for the protection and relief of unfortunates, as asylums for the poor, for the deaf and dumb, or for the insane."

Now is the institution in question, in its nature, object, and purpose an asylum according to the plain meaning and common acceptation of the term? The act which establishes it provides for a principal, who shall report to the governor prior to each session of the legislature the number of *pupils*, their names, age and sex, the *studies* and trades taught, and also provides for

teachers. The term *principal* as here used, and those of *teachers* and *pupils* are those which peculiarly signify and designate instructors and students in a school established for the purpose of educating persons of suitable age and capacity in the sciences. But section seventeen seems clearly to define this institution as one for " educational purposes." It provides that " all blind persons within the state, of suitable age and capacity, shall be entitled to an *education* in the institution at the expense of the state," and further provides that '' each county superintendent of common schools shall report to the principal of the institution on the first day of April of each year the number, age, residence and post-office address of every blind person, and every person blind to such extent as to be unable to acquire an *education* in the common schools '' in his county. The act also appropriates two thousand dollars annually, or so much thereof as may be necessary to meet the ordinary expenses of the institution, and that the current expenses " shall be drawn by warrants upon the temporary school fund of the state." Now if the words employed are to be taken according to their ordinary and common acceptation, and effect is to be given to the act according to the plain import of its provisions, it is quite clear that the institution was designed to constitute a distinct department of our grand system of general, free education, which, with its magnificent school fund, is the pride of the state.

The primary and sole object of the institution then, is to furnish blind persons of suitable age and capacity with a thorough practical education, and in doing this the state has only done tardy justice by placing this class of persons upon an equality in advantages of education with those who are taught in the other educational institutions of the state. And the imposition of duties upon each county superintendent in connec-

tion with the institution, the provision for the selection of a principal and teachers, and the admission of pupils of suitable age and capacity to receive an education, and the payment of current expenses by warrants drawn upon the temporary school fund, certainly make it a part of the public educational system of our state. The current expenses of instruction in our common schools, in the normal school, and state university are paid by the state, but no one will contend that for this reason they become mere asylums for the protection and care of unfortunate persons; and it would be as much a perversion of the import of language and the ordinary and common acceptation of terms to say that the school for the education of blind persons is such an asylum. This institution is not in any sense a place for the protection and care of blind persons generally; on the contrary only those who are of suitable age and capacity to receive an education are admitted; and upon this principle all other public schools and educational institutions of the state are conducted.

It was, however, contended that because an appropriation is made to meet the ordinary expenses of the institution, including furniture, books, maps and instruction in some manual arts, whereby the pupils may be taught trades, and thus afforded the means of supporting themselves in after life, it is a charitable institution, and should therefore be adjudged an asylum.

But if for this reason it must be adjudged an asylum, then for a like reason our state university and normal school must be adjudged mere asylums; for the act establishing the university provides for a department of agriculture in which the student is taught the science and manual art of practical farming at the expense of the state, and there is also a department in which the fine arts and the principles of painting and sculpture are taught; and the act to locate, establish, and endow

the state normal school provides for "instruction in the mechanic arts and in the arts of husbandry," and appropriates money of the state to purchase apparatus and to put the school in operation. And certainly it cannot be maintained that practical instruction in the manual art of some trade is any more a departure from an educational institution than instruction in the art of farming, husbandry, painting, and sculpture; nor will it be seriously contended that because the law provides for instruction in such arts it deprives these institutions of their educational character and purpose. Therefore the correct interpretation of these laws, establishing these departments of instruction, is, that they are designed merely to extend the curriculum of these educational institutions, and not to change or affect their nature and purpose as such schools. All these institutions—as well the one for the education of the blind as the others—being essentially for educational purposes, and designed as parts of the general free system of education of our state, are by the clear, express provision of section nineteen, Art. V, of the constitution, excepted from the supervision and control of the board of public lands and buildings.

The proposition—whether the institution in question is or is not for educational purposes—must be determined in the affirmative or negative, for the answer to it cannot be evaded. If answered in the affirmative (and that it must be so determined will hardly be questioned) then it comes within the constitutional exception, by whatever name it may be called, for the constitution without any reserve or limitation excepts "those for educational purposes" from the supervision of the board. And if the court can take any one educational institution out of this exception, it certainly can by an exercise of the same power do likewise in respect to any other or all the other educational institutions of the state;

but to do so it seems to me would be a direct subversion of the constitution.

The law seems well settled that an action by mandamus will lie to compel an officer to deliver up property of the state held by him without right or authority of law; but for the reasons given in this opinion, I think, the writ of mandamus must be denied in the case at bar.

MAXWELL, J.

I concur in the opinion prepared by my brother Gantt, so far as it holds that the board of public lands and buildings have no power to appoint and remove the principal. It is also admitted that the word " asylum " in its original signification has no application to the institution for the blind, if indeed it applies to any institution in the state. It will also be conceded that in the institution in question the inmates are instructed in various branches of learning adapted to the blind. Section 13 of the act approved February 19, 1875, " to erect and maintain an institution for the blind," provides that, " for the purpose of meeting current expenses, there is appropriated out of the state treasury so much as is necessary, not to exceed forty dollars per quarter to each pupil in said institution, *provided* that such amounts shall be drawn by warrants on the temporary school fund of the state." Section 17 provides that all blind persons resident of the state, of suitable age and capacity, shall be entitled to an education in this institution, at the expense of the state.

Do these provisions make this an institution for merely educational purposes? I think not. It is properly a charitable institution, where an unfortunate class of individuals are received, maintained, and educated (if need be) at the expense of the state. If not an asylum in the primary meaning of that word it is at least an in-

stitution for the relief of a class of the unfortunate. Section 19, article V, of the constitution provides that "the commissioner of public lands and buildings, secretary of state, treasurer, and attorney general, shall form a board, which shall have general supervision and control of all the builings, grounds and lands of the state, the state prison, asylums, *and all other institutions thereof*, except those for educational purposes." As in my view this is not an educational institution within the meaning of the constitution, it follows that the board of public lands and buildings have the general custody and control of the institution, but as the constitution has vested the power to appoint and remove the principal in the governor, the writ must be denied.

LAKE, CH. J.

I was absent during the argument of the respective counsel and therefore am not in possession of the points on which they severally relied, and but for the disagreement of my brother judges on one of the principal questions would have remained silent.

The court are agreed however that the writ of mandamus must be denied, on the ground that the attempted removal of the respondent from his office of principal was in excess of the power granted to the board of public lands and buildings, and therefore a void act. We are also agreed that this power, as well as that of filling a vacancy in that office, is vested alone in the governor.

As to the particular class of the institutions mentioned in section 19, article V of the constitution to which the institution for the blind properly belongs, I entertain no doubt whatever that it falls within the one denominated, "asylums." It is very clear that it is an institution intended to relieve, protect, and support if need be, for a time an unfortunate class of our people,

and is decidedly charitable in all its aims and purposes. And one of the meanings given to this word in its modern use by lexicographers is: "An institution for the protection and relief of unfortunates, as an asylum for the poor, for the deaf and dumb or for the insane." And this is the sense in which it has come to be generally used and understood by the people. Nor can it be reasonably doubted that it was so understood by the convention that framed this section of the constitution, and by the people when they adopted it. If the question were propounded to the people of the state, "What asylums have we?" who can doubt that the universal response would be, "the deaf and dumb, the blind, and the insane."

The constitution was made by the people, and for the people. The words and terms employed were used with reference to existing facts, and in their ordinary and popular sense, and it is in this sense that they should be used by the courts in construing the several provisions of that instrument.

Two members of the court agreeing that this is not an educational institution, it follows that it is within the control of the board of public lands and buildings. The peremptory writ must be denied.

WRIT DENIED.