G. H. LAWRENCE v. J. H. LEIDIGH et al.

No. 10532.

INMATES OF SOLDIERS' HOME—*acquire no residence as voters in county where institution located.* Section 3, article 5, of the Constitution, disables persons kept at any asylum at public expense from acquiring a residence there for voting purposes ; therefore the inmates of the State Soldiers' Home located in Ford County, who have removed there from other parts of the State, are disqualified from participating in the elections held in such county.

Original proceedings in *quo warranto.* Opinion filed October 29, 1897. *Judgment for plaintiff.*

*B. F. Milton* and *Overmyer & Mulvane,* for plaintiff.
*Ed. H. Madison,* for defendants.

DOSTER, C. J. This is an original proceeding in *quo warranto,* to determine the right of the defendant as against the plaintiff to hold the office of county clerk of Ford County. The parties were opposing candidates for the office named at the general election in 1895. The defendant received a majority of the votes cast, and thereafter qualified and entered upon the duties of the position. The facts have been agreed upon, and from them it appears that, outside of the ballots cast by certain inmates of the State Soldiers' Home located in the county, the plaintiff received a majority of the votes. The right of the inmates of the Home to participate in the election is the sole question for decision.

The legislation respecting the establishment and maintenance of this Home and the government of its inmates began in 1889. In that year, the Legislature, by concurrent resolution, requested our Senators and Representatives in Congress to endeavor to secure the donation to the State of the Fort Dodge Military Reser-

vation, in order "to provide for its indigent soldiers and sailors proper and suitable homes for their declining years." (House Concurrent Resolution number 49.) At the same session, in anticipation of the making of the donation asked, an act was passed establishing the Home, providing for its management, and making a conditional appropriation for its support. Since then, it has been, like all other State institutions, supported by biennial appropriations. The act in question provided :

"All honorably discharged soldiers, sailors and marines who served in the army and navy of the United States during the war of the rebellion, and who may be disabled by disease, wounds or old age, or otherwise disabled, and who have no adequate means of support, and who by reason of such wounds, old age or disability are incapacitated from earning their living and who would otherwise be dependent upon public or private charity, together with such members of their families as may be dependent upon them for support, shall be entitled to admission to such institution, subject to the rules and regulations that may be established by the board of managers for the government thereof." Laws 1889, ch. 235, Gen. Stat. 1889, ¶ 6235.

March 2, 1889, Congress authorized the desired conveyance to be made, upon the condition :

"That said State . . . shall within three years establish and provide for the maintenance thereon a home in which provision shall be made for the care and maintenance of officers, soldiers, sailors, and marines, who have served in the army, navy, or marine corps of the United States, their dependent parents, widows, or orphans, and under such rules and regulations as said State may provide." U. S. Statutes at Large, Vol. 25, ch. 420, p. 1012.

In 1893, an act was passed specifying some additional details of management of the Home, and providing, among other things, that applicants for

admission should furnish a certificate by the board of county commissioners of the county of their residence, stating their inability to properly support themselves and families without aid from such county ; and also providing that, save in certain specified exceptional cases, wives of inmates should not be admitted with them to the Home unless they had attained the age of forty years, nor girls over the age of fourteen, nor boys over the age of twelve years. Laws 1893, ch. 148.

The State legislation thus noted, and the rules of the board of management authorized thereby, provide for the residence in separate cottages of such of the inmates and their families as can be accommodated in that way, and also provide for the cultivation by the inmates of the lands forming part of the Home, for the maintenance of the institution in that way, so far as it can be. Family and not communal life, in the case of such of the veterans as have families, is the rule of the institution, so far as the accommodations will allow ; while as to unmarried men, barracks and mess privileges, somewhat after the manner of army life, are provided. A large majority of the inmates who voted were married men residing with their families upon the Home lands; and it is agreed in the statement of facts :

"That all said persons, both married and single, at the time they moved from various counties in Kansas, where they resided previous to moving to the Home, abandoned their old homes with the intention of making their permanent abiding place and their homes in the State Soldiers' Home at Fort Dodge, Kan. ; that they actually took up their residence in the houses and quarters assigned them in said Home with the intention upon their part of making the same their homes ; and during the time they resided therein they intended and claimed said houses and quarters in said State Soldiers' Home to be their homes ; and while they resided in said houses they had no other homes ;

and that they were their fixed habitations, to which, when they were absent, they intended to and did return."

The act of 1889 authorized the board of management to prepare and promulgate a system of government for the Home, embracing such regulations as might be necessary for the preservation of order, the enforcement of discipline, and the security of the health of the inmates. Conformity to these rules is of course required, and, as we assume, under the compulsion of discharge, although such is not so declared in the statute, nor does the agreed statement of facts so recite; but, it may be taken for granted that, under the rules of the institution, permanency of stay is conditioned upon obedience to the reasonable regulations prescribed.

The constitutional provisions bearing upon the question for decision are as follows:

"Every white male person of twenty-one years and upwards . . . who shall have resided in Kansas six months next preceding any election, and in the township or ward in which he offers to vote, at least thirty days next preceding such election, shall be deemed a qualified voter." Const., Art. 5, § 1.

"For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, nor while engaged in the navigation of the waters of this State, or the United States, or of the high seas, nor while a student of any seminary of learning, nor while kept at any almshouse or other asylum at public expense, nor while confined in any public prison." Const., Art. 5, § 3.

Upon the part of the plaintiff, it is insisted that the section last quoted precludes an inmate of the Soldiers' Home from acquiring at such Home the residence required by the section first quoted. Upon the part of the defendant, it is insisted that the section

last quoted does nothing more than declare a disputable presumption — does nothing more than declare that the fact of occupancy of a public asylum raises a presumption of disqualification, repellable, however, by evidence of removal of residence and fixity of intent to remain. If the contention of the defendant as thus stated be sound, there is no question but he has overcome in behalf of the inmates of the Home the presumption of disqualification to vote. The agreed statement of facts above quoted shows that these inmates abandoned their former places of abode with no intention of returning thereto, and took up their residence at the Soldiers' Home with the intention of permanently remaining there ; such of them as had families removing them and their household goods and other personal belongings. We apprehend that the fact that their right to remain is conditioned upon their observance of the rules of the institution, and their ability to remain likewise conditioned upon the continuance of the bounty thus far provided, cannot be taken to qualify their intention to remain. Permanency of residence is always conditioned upon such contingencies as may thereafter occur, and an intent of the most fixed character to remain at a given place is always held subject to both the fortuitous and designed circumstances of the future. Nor can there be any question that, under the legislation of the United States and of this State and the rules of the Board of Management, the places provided for the veterans in question were provided for them as *homes*. The institution as an " asylum," place of retreat or shelter, has grafted upon it the feature of home life, not only as respects its management but its purpose as well.

The first matter of importance to determine is the character of the place in question. Is it an " asylum,"

within the meaning of the constitutional provision quoted? Our judgment is that such is the case. The Supreme Court of Michigan had under consideration the precise question, and expressed its opinion thereon in the following language :

"The Soldiers' Home is purely eleemosynary in character. To hold otherwise would be contrary to sound legal principle and good sense. The title to the act shows it. It is not the character of the beneficiaries, nor the cause of their inability to earn a living, nor the reason for granting the bounty, which determines whether such an institution is charitable in its character. An institution established and maintained for the support of indigent persons who become blind or deaf in the service of their country or State is as much eleemosynary as one established for the support of those who were born blind or deaf, or who have become so from other causes. All institutions in this State, established and maintained at the public expense, for the care, education, and support of the unfortunate, belong to this class of institutions, and are included in the term 'asylum,' used in the above clause of the Constitution. It is immaterial whether they are called schools, retreats, homes, or asylums. It is equally immaterial what the feeling is which prompts their erection and maintenance. An 'asylum' is defined by Webster to be 'an institution for the protection or relief of the unfortunate.' Such is its meaning as used in the Constitution. It follows that one's entry and residence in such an institution partake of the same character as the institution itself, and are likewise eleemosynary in character." *Wolcott v. Holcomb*, 97 Mich. 361–363, 364.

The proposition next to be considered herein was also involved in the case in Michigan. Upon it the members of the court were divided in opinion, but no dissent was expressed from the view taken of the character of the institution as an asylum within the meaning of the Constitution. In this view of the character of such institutions we also concur. We

cannot think that the plan of life at the Home, as family instead of communal, nor any other departure made by it from the ordinary method of conducting such institutions, changes its nature. Its eleemosynary character is fixed in its benevolent design, not in the measure of control exercised over its inmates nor in the method of administering its charity. We have, therefore, no doubt that a home for the indigent veterans of the wars, such as the one established in this State, is an "asylum," as that word is used in the Constitution. That its inmates are kept at public expense, need not be argued; it is admitted.

The inquiry, then, occurs : Can such inmates acquire at this asylum a residence for voting purposes? This inquiry was also made in the case of *Wolcott v. Holcomb*, supra, and was answered in the negative by a majority of the Supreme Court of Michigan, under constitutional provisions identical in language with ours. These provisions have already been quoted. For the purpose of their application to the precise case in hand, such of their terms as relate to collateral but not necessarily connected matter may be eliminated, so they may be read as follows :

"Every male person of twenty-one years and upwards who shall have resided in Kansas six months, and in the township or ward in which he offers to vote, thirty days, next preceding any election, shall be deemed a qualified voter ; but, for the purpose of voting, no person shall be deemed to have gained or lost a residence while kept at any almshouse or other asylum at public expense."

Thus read, there appears to us slight ground upon which to base a claim of competency to vote in the inmates of the Soldiers' Home. It will be observed that the provision quoted does not disfranchise these inmates. No more shall they be deemed to have lost their former residence than they shall be deemed to

have gained a new one while kept at the asylum.   No matter how settled their determination to abandon their former places of residence, nor how protracted their stay in their new home, the Constitution preserves to them their electoral privileges in the event of their return.   Whether that return be for the purpose of resuming the old habitation or for the purpose merely of casting a ballot, the right to vote, throughout all the time of absence, is fully retained.

It is no sufficient answer, upon the mere question of interpretation, to say that many to whom the right of voting is thus saved live at distances too remote and suffer other disadvantages too great to make its enjoyment practicable.   The burden is no greater upon an inmate of the Home than upon many others whose lives are largely spent at distances far from the place which the law assigns for the exercise of the voting privilege, and upon whom travel thereto entails expense which can be illy borne.

The language of the Constitution is: "For the purpose of voting, no person shall be deemed to have gained  .  .  .  a residence while kept at any .  .  .  asylum at public expense."   The Standard Dictionary gives the word "deem" the following definitions:  "To hold in belief, estimation, or opinion.". "To judge; adjudge; decide; sentence; condemn." "To have or be of an opinion."   Its synonyms are "esteem" and "suppose."   The defendant is constrained by the logic of his contention to rest his case upon the theory that the Constitution simply declares a rule of evidence — simply raises a presumption of disqualification; but none of the shades or variations of meaning possessed by the word "deemed" admit the raising of such presumption upon the language of the Constitution.   For voting purposes, no person while kept at an asylum at public expense shall be

adjudged or declared to have gained a residence ; nor of him shall the gaining of a residence be held in belief or estimation ; nor as to him shall any one have or be of an opinion that he has gained such residence. This is the meaning which the law, as well as common usage, has affixed to the word " deemed." *Commonwealth v. Pratt*, 132 Mass. 246 ; *Blaufus v. People*, 69 N. Y. 101, 111 ; *Leonard v. Grant*, 5 Fed. Rep. 11–16.   Such residence shall not be gained " while " kept at any asylum.   The definition of " while," as a conjunction and also as an adverbial modifier, is, " during the time that; as long as."   Therefore, no residence shall be gained during the time that, or as long as, the person is kept at an asylum.

The decisions upon the precise question are few in number.   But three have been called to our attention. Those of *Wolcott v. Holcomb*, supra, and *Silvey v. Lindsay et al.*, 107 N. Y. 55, are to the same effect as the one we make.   That of *Stewart v. Kyser*, 105 Cal. 459, is in opposition.   It also appears, by records of the United States District Court for this district which have been called to our attention, that, in an unreported case, entitled *United States v. Rowdebush*, being an indictment for illegally voting at an election for Representatives in Congress, a decision similar to that of the Supreme Court of California was made upon an agreed statement of facts ; but we are constrained by what we regard as the true interpretation of the Constitution, derived out of the settled and authoritative meaning of the words used, to follow the New York and Michigan decisions, and to hold that, notwithstanding the abandonment by the veterans in question of their former places of abode and their settlement at the Soldiers' Home with the fixed intention of remaining there, they cannot acquire a residence at such Home for voting purposes.

It may also be remarked that such, too, is the plain statutory provision. The law of 1893 (ch. 148, § 5) declares: ''Inmates of this Home shall not lose their legal residence in the county from which they came, nor acquire any legal residence in Ford County, Kansas, while they remain as inmates of said Home.'' This statute is vigorously assailed as conflicting with section 1, article 5, of the Constitution, which fixes, as to residence, the general rule upon the subject of electoral qualifications. 'Whether it does so conflict is involved in the question just decided. It does not conflict with the rule of exception contained in section 3 of the same article, but is in harmony with it; and, therefore, if the case were to rest upon it and not upon the Constitution itself, it could be upheld. Judgment for plaintiff is therefore ordered.