THE PEOPLE OF THE STATE OF NEW YORK ex rel. TRUSTEES OF THE MASONIC HALL AND ASYLUM FUND, Relator, *v.* WILLIAM STANLEY MILLER and Others, Constituting the Board of Taxes and Assessments of the City of New York, Respondents.

Supreme Court, Trial Term, New York County, May 29, 1937.

John A. Dutton, for the relator.

Paul Windels, Corporation Counsel [Laurence J. Rittenband of counsel], for the respondents.

BREWSTER, J. This is a certiorari proceeding wherein relator seeks to have canceled and set aside an assessment of taxes made and levied for the year 1935 upon certain real estate owned by it in the city of New York, viz., at Twenty-third street and Sixth avenue and extending through to Twenty-fourth street, in the borough of Manhattan. Said property is known on defendants' tax maps as Lot 1 (Twenty-third street) and Lot 76 (Twenty-fourth street). Relator thus proceeds upon the ground that its said property is wholly exempt from taxation.

The commissioners of taxes and assessments assessed this property on October 1, 1934, for $2,580,000. On relator's application to the defendants for a cancellation thereof, and after a hearing by it, the application was refused but the assessment was reduced to one of $1,500,000 on said property as an entirety.

Relator claims that said property is exempt by virtue of subdivision 6 of section 4 of the Tax Law, and, in the alternative, that its exemption obtains under a special act, viz., chapter 249 of the Laws of 1871. Defendants contend that, notwithstanding the fact that the assessment now reviewed is the first one which was ever made on this property since owned by the relator (a substantial portion thereof having been acquired by it in 1868), still that neither under the act of 1871 nor the Tax Law is it entitled to any exemption whatsoever in view of the actual, direct uses to which, as a matter of conceded fact, said property is now and for many years past has been made subject by relator.

A somewhat extended chronology of the origin and history of relator, the legislation with reference to it and its temporalities, and its acts and conduct with respect thereof seems necessary as a preface to the views which form the basis of the conclusions hereinafter stated.

The Grand Lodge of Free and Accepted Masons of the State of New York was created and organized in the year 1791 under and pursuant to a charter from the Grand Lodge of Free and Accepted Masons of England. Under this charter and the general laws of Masonry, the first-named Grand Lodge was empowered to charter subordinate lodges composed of Free and Accepted Masons. It exercised this power from time to time to October 1, 1934, on which date there were in existence in the State of New York 1,034 of such subordinate lodges composed of members of the Masonic fraternity, the total number on said date being approximately 300,000. From its formation to date this Grand Lodge was composed of a grand master, deputy grand master, senior grand warden, junior grand warden, grand treasurer and a grand secretary, all of whom were elected by its subordinate lodges at annual communications of said Grand Lodge, and of numerous other appointive officers and committees, and representatives of each and every lodge in the State, all engaged in the administration of the affairs of said Grand Lodge.

In 1842 Greenfield Pote, a man advanced in years, dependent upon the labor of his hands for support of himself and family, and a member of the Masonic fraternity, deposited upon the altar of the Grand Lodge one dollar as the first contribution toward the building of a home for indigent Masons and their families. This contribution was turned over to a committee appointed by the Grand Lodge, called the " Committee on Hall and Asylum Fund," and charged with the duty of soliciting funds from the members of the Masonic fraternity for the purpose of erecting a Masonic hall in the city of New York for the accommodation of said Grand Lodge and another Masonic. bodies, the income therefrom to be used for building and maintaining such a home for indigent Masons and their families. This committee was continued from year to year until the year 1864, when and for some years prior thereto it was composed of the five principal officers of Grand Lodge, and at that time they had collected for the purposes for which they were appointed as such committee, a sum in excess of $49,000.

In that year (1864) the Legislature enacted an act incorporating the members of this committee and their successors in office as a body politic and corporate and which said corporation is the relator herein. (Laws of 1864, chap. 272.) This act, and the several amendments thereof, viz., Laws of 1873, chapter 503; Laws of 1877,

chapter 350; Laws of 1885, chapter 55; Laws of 1890, chapter 105; Laws of 1898, chapter 666; Laws of 1923, chapter 264, defined its powers and declared its purposes. The objects as stated in this original act of incorporation were: " to build and maintain a Masonic Hall in the City of New York, for the meeting of the Grand Lodge or General Assembly of Masons, and for the accommodation of other Masonic bodies or associations; and out of the funds derived from the rent or income thereof, or other source, to build, establish and maintain an asylum or asylums, school or schools, for the free education of the children of Masons, and for the relief of worthy and indigent Masons, their widow and orphans." Shortly thereafter and in 1868 the relator purchased that portion of the premises in question situate at the northeast corner of Twenty-third street and Sixth avenue, being the land described as Lot No. 1, block 825, section 3, on the assessment rolls of the city, and received a deed thereof which was duly recorded on September seventh of that year.

Three years later, in 1871, came the enactment of an act entitled, " An Act to exempt the real estate of the Trustees of the Masonic Hall and Asylum Fund from taxation." This was contained in chapter 249, passed April 1, 1871, and section 1 thereof reads as follows: " The real estate now owned, or which may hereafter be acquired, for the construction and maintenance of an asylum by the Trustees of the Masonic Hall and Asylum Fund, a corporation created for benevolent purposes, so long as the entire income from the same shall be exclusively used for benevolent and charitable purposes, shall be and remain exempt from taxation." Next came the enactment of 1873 which amended the original act of relator's incorporation by enlarging its powers so as to permit it " to rent such part or parts of said Masonic Hall, now being erected by them, on the corner of Sixth avenue and Twenty-third street * * *, and such part or parts of any other building or buildings erected or to be erected and owned by such corporation, as in their judgment shall not be required for actual use and occupancy for Masonic objects and purposes, to such individuals or corporations as they may select, for mercantile or other purposes, and to sue for, recover and collect the rents from time to time accruing thereon, and to use and appropriate the funds to be derived from such renting, for the benevolent, educational and charitable purposes mentioned and provided in said act hereby amended." (Laws of 1873, chap. 503.) The " Masonic Hall " referred to in the act of 1873 as then " being erected " was completed in the year 1875 at an approximate cost of $1,680,000.

Two years later and in 1877 came the act of that year which amended relator's act of incorporation by changing its personnel from that of the aforesaid elective Grand Lodge officers to officials elected from time to time by the Grand Lodge. (Laws of 1877, chap. 350.) It is to be noted that at all times from its incorporation as a fraternal corporation to date, the relator was the operating body to carry out the purposes of the Grand Lodge, under its control and subject to its direction, and at all of said times it was a part of, and its acts and conduct were those of, the Grand Lodge.

Next in point of time came the act of 1882 (Chap. 410) described as "An Act to consolidate into one act and to declare the special and local laws affecting public interests in the city of New York." As indicated by the title, this was a voluminous enactment embracing twenty-nine chapters and employing a separate volume of the Session Laws of that year for its expression. Chapter XVI had to do with tax and assessments and section 824 thereof declared that there "shall be exempt from all taxation in addition to any which may be exempt by virtue of general laws: Any real estate now owned or hereafter acquired for the construction or maintenance of an asylum by the trustees of the Masonic Hall and Asylum Fund, but such exemption shall continue only so long as the entire income from the same shall be exclusively used for benevolent and charitable purposes." This was merely a new codification of the aforesaid act of 1871.

We are now brought to the year 1889 when the relator purchased a tract of land in the county of Oneida, partly within and partly adjoining the city of Utica, where it thereafter established a Masonic home by the erection thereon of a building for the maintenance and care of indigent members of the Masonic fraternity in the State of New York, and their wives, widows and orphans. This building was completed in the year 1893, since which time a number of other structures have also been erected there in furtherance of the purposes of relator. The moneys required for these were all raised and provided by the said Grand Lodge.

When the Tax Law was codified in 1896 (Laws of 1896, chap. 908) no tax exemptions were included with respect to property of fraternal corporations and, it is significant, that as to those corporations or associations of the kind and character enumerated, whose real property was granted exemption from taxation, the general rule was declared that to be entitled thereto two requirements were to be complied with, viz.: (1) Exclusive organization for one of the prescribed purposes, and (2) exclusive use of the real estate for carrying out *thereupon* one or more of such purposes. (Laws of 1896, chap. 908, § 4, subd. 7.)

It was not until 1903 that the general statute law of the State first granted an exemption from taxation as to the property of a fraternal corporation. (Laws of 1903, chap. 204.) In that year the aforesaid subdivision 7 of section 4 of the Tax Law of 1896 was amended and thereby the real property of a fraternal corporation was given an exemption subject to the same conditions as presently obtained by the existing statute. (Tax Law, § 4, subd. 6.) This amendment enactment of 1903 is verbatim with the present law, having survived to the present time without change of jot or tittle through the many amendments to the Tax Law from 1903 to the present time. It may well at this point be specially noted that when the State changed its general policy so that at the first time it granted a tax exemption as to real property of a fraternal corporation, it did so by laying down certain conditions and qualifications with respect thereto which were virtually identical with the character, the power and the purpose and objects of the relator. Indeed, the statutory declaration of the conditions under and by which this new State policy was enunciated is an almost verbatim statement of the purposes and objects of the relator as declared in its original act of incorporation, and in substance it is the same.

We now look forward from 1903 for other developments. The next step occurred two years later when, in 1905, relator purchased the premises adjoining said Lot No. 1 and which fronts on Twenty-fourth street and is described as Lot No. 76, block 825 of section 3 on the city's assessment roll, being the remainder of the property involved in this proceeding. Relator's deed to this property was duly recorded on December 27, 1905. Thereafter and in the years 1906–1908 relator erected on this, the Twenty-fourth street, property, the structure which presently stands there, at an approximate cost of $1,507,000.

It seems proper to here recount that of the circumstances which shortly thereafter led to a later extension in building construction on the adjoining Twenty-third street property, were portions of an address made by the then grand master, Townsend Scudder, at a meeting of the Grand Lodge in the Masonic Hall on the Twenty-third street property in the spring of 1907, and which preceded the decision of the fraternity to erect the adjoining building. Portions of this address are as follows: " That we have been remiss in permitting our real estate investment to continue to make so poor a return on the capital involved is hardly open to question. Freed from the burden of taxation because the proceeds of the building above expenses are devoted to charity, to wit, the support of the Home, under the compact with the State, the duty arises upon us to make our property as productive as its peculiar uses permit.

* * * This hall property, [the Twenty-third street property] belongs to the fraternity of the State, belongs to every Lodge in the State. Because the revenues of this hall property were applied to charitable purposes, to the support of the indigent and the education of our little children, which work lessened the burden of the State, the Legislature of the State, a few years ago, freed us from the burdens of taxation on the property. The duty then devolves upon the fraternity, not only to maintain, but to increase, the property's earning capacity. * * * There are available in our fraternity men of vast experience who are willing to help us to solve our financial problems and I sincerely hope that the wisdom of this communication of the Grand Lodge may find a way, a suitable and proper way, or pave the way, to the ultimate full discharge by us of our obligation to the State, for, under our compact with the State our fraternity was to be freed from taxation and in return we were to devote the income from this building [the Twenty-third street property] to charity. The building should bring in 8% or 10%. It is bringing in about 2%. Are we honest with the State? We cannot say we are if we accept its favors and avoid our obligations or neglect them. A way must be found of solving the problem of making this property [the Twenty-third street property] revenue producing proportionally to its value, and I trust that the wisdom of this communication may discover that way."

The erection of the new building on the Twenty-third street property followed the aforesaid communication. In the years 1910–1912 relator demolished the old building it had previously, in 1875, erected on the Twenty-third street property and in place thereof erected the structure which now stands there, connected as it is with the building on the Twenty-fourth street property so that together they form one integral building covering the two lots, the moneys for the erection of which was contributed by the Grand Lodge, its subordinate lodges and members of the Masonic fraternity.

All of the statements of fact in the foregoing chronology are without dispute and it is likewise conceded that all of relator's said property in New York city has been used by relator in good faith for the maintenance of the meeting place of the Grand Lodge and for the accommodation of other Masonic bodies or associations and that all of the net income from said property has been used by the relator for the building and maintenance of said home at Utica; that the average annual net income therefrom from the time of the completion of said building in 1912 to October 1, 1934, was approximately $134,252, whereas the average annual cost of the maintenance of said home at Utica and in caring for

said persons therein, was, during like period, approximately $313,701, the difference between these two average sums having been met by payments by the Grand Lodge by assessments imposed upon members of the fraternity throughout the State and by voluntary contributions from such members and others. It is likewise conceded that a portion of the present building situate upon the lot fronting on Twenty-fourth street is and was as of the date of the assessment, used for meetings of the general assembly of the said Grand Lodge, meetings of its subordinate lodges and other Masonic lodges, with the exception of three and one-half floors which are used for mercantile and other purposes, and that a portion of the remainder of the building, that which fronts on Twenty-third street and Sixth avenue, as of said date, was used for Masonic organizations and bodies and the remainder thereof for mercantile and other purposes. It is likewise conceded that the benefits accruing to the inmates of the home or hall and asylum at Utica are pure charity; that the number of persons so cared for at said home has steadily increased to October 1, 1934, and that on that date there were at said home, so cared for by relator, 438 adults and 162 children, or a total of 600, and that the care and maintenance of said persons, or most of them, had they not been so cared for, would have devolved upon the State in that they were indigent and in destitute circumstances without other means of support or relatives or friends who could or would support them, and without any one under legal liability therefor.

Of the other aforestated enactments pertaining to relator, viz., Laws of 1885, chapter 55; Laws of 1890, chapter 105; and Laws of 1898, chapter 666, these merely amended the original act of incorporation generally with reference to internal government, and the last named act also redeclared its objects. Then came chapter 264 of the Laws of 1923 which repealed these earlier enactments with reference to relator but continued its existence " with all of the powers and exemptions " theretofore granted by general and special acts, expressly including the present statutory exemptions from taxation, viz., Laws of 1909, chapter 62, section 4, subdivision 7 (now 6).

I am persuaded to the view that any proper approach to the construction of the pertinent portion of the existing statute (Tax Law, § 4, subd. 6) entails an interpretation of the earlier special enactment which first granted a tax exemption to the relator in 1871. (Laws of 1871, chap. 249.) The title of this earlier act is of some significance. It styled itself an act to exempt relator's real estate from taxation. Without qualification it thus, literally, grants exemption generally and totally. Some ambiguity is met

with in the forepart of its enacting clause in that the average person may read it so as to encompass and state two meanings. It states that the real estate of relator which is made exempt from taxation is: (1) That which is owned or hereafter acquired by it, and (2) which is thus owned or acquired for the construction of an " asylum " by relator. Thus this second definition may, literally, mean the real estate which the " asylum " itself comprises, and only that, or in addition thereto *such property owned or acquired for the purpose of thereby obtaining means for the establishment of an asylum thereon or elsewhere.* Defendants contend for the former, more limited and, doubtless, in a strict and grammatical sense, more literally precise and correct interpretation, and, so contending, invoke the aid of the rule of strict construction which applies to tax exemption statutes. (*People ex rel. Young Men's Assn.* v. *Sayles,* 32 App. Div. 197; affd., 157 N. Y. 677; *People ex rel. Medical Society* v. *Neff,* 34 App. Div. 83; *People ex rel. D. K. E.* v. *Lawler,* 74 id. 553. See, also, *People ex rel. Mizpah Lodge* v. *Gurke,* 228 N. Y. 245; *People ex rel. N. Y. Lodge No. 1* v. *Purdy,* 179 App. Div. 805; affd., 224 N. Y. 710; *People ex rel. Masonic Hall Assn.* v. *White,* 218 App. Div. 38; affd., 244 N. Y. 564; *People ex rel. Andrews* v. *Cameron,* 140 App. Div. 76; affd., 200 N. Y. 585.) However, with a due regard to the various lights which may be brought into play to reveal the true meaning of what the Legislature intended by this perhaps too simple phrase, I feel constrained to the other and latter view and for these reasons: In the first place the broader interpretation does no violence to the generality of the title of the act with which the narrower one conflicts. (*People* v. *O'Brien,* 111 N. Y. 1; *People ex rel. Peake* v. *Columbia Co.,* 43 id. 130; *People* v. *McCann,* 16 id. 58.) In the interpretation of the legislative intent in enacting a private act the title thereof comes specially into play because the subject of such a law must be embraced in its title in order to preserve its constitutionality. (State Const. art. 3, § 16; *People ex rel. Cooke* v. *Wood,* 71 N. Y. 371; *People ex rel. Westchester Fire Ins. Co.* v. *Davenport,* 91 id. 574. And see generally, Statutes and Statutory Construction, by Arthur F. Curtis, McKinney's Cons. Laws, book 1, §§ 66, 94, and cases there cited.) Again, we may not lose sight of the patent premise that the whole matter of the grant was made dependent upon the express condition that the " income " from the exempted property be " exclusively used for benevolent and charitable purposes." Those purposes were specific as defined in relator's charter and, when effectuated, they relieved the State of certain financial burdens. It was for this application of income to the support of those who would otherwise be wards of the State that the latter may be said to have bargained

when it gave the exemption. Thus the narrower and more strict interpretation contended for produces an anomaly. In the sense which this statute uses the word, it seems beyond dispute that by *asylum* is meant " an institution for the protection or relief of some class of destitute, unfortunate, or afflicted persons," and that the word *income* as there employed means " something that comes in as addition or increment * * *. That gain or recurrent benefit (usually measured in money) which proceeds from labor, business, or property," and is synonymous with, " gain, profit, proceeds, * * * receipts, interest, emolument, produce." (Webster's New Int. Dict. 2d ed.) Hence an *income producing asylum* can have no place in the field of reasonable interpretation. (McKinney's Cons. Laws, book 1, §§ 77, 79, 80, 81, and cases there cited.) We must give interpretation to the whole statute and especially to that which was intended by the express and vital condition as to the application of income. Looking then to the declared objects and purposes of the relator which, only three years before the enactment, it had espoused as the cause of its creation, we can see no other reasonable interpretation of the phrase in question than that it meant the very place, it being then the only place, it owned, and upon which it was to build a meeting place for the purpose of the fraternity and out of the revenue and income from which it designed to practice its declared purposes of charity and benevolence. So read and thus construed, then all of the act is plain, understandable and reasonable. No anomaly is met with, the grant of exemption is consistent with the title of the act, squares with the declared purposes of the beneficiary and presents a view that fits into the practicalities and probabilities of the situation presented, and, in my opinion, must have been exactly what the Legislature intended. This view is strengthened by the fact that, concededly, all parties in interest, personally and officially, acted in accordance with this interpretation for the ensuing sixty-four years. It has been held that " There is no question that the practical construction of a statute by those for whom the law was enacted or by public officers whose duty it is to enforce it, acquiesced in by all for a long period of time, is of great importance in its interpretation in a case of serious ambiguity." (*Grimmer* v. *Tenement House Dept.*, 205 N. Y. 549. See, also, *Matter of City of New York*, 217 id. 1. See generally McKinney's Cons. Laws, book 1, §§ 108, 109, and cases there cited.)

Next in point of time came the efforts to bring about a general revision of the Tax Laws of the State. No such revision had been accomplished since the Revised Statutes of 1828, since which time about one hundred supplementary acts had been passed including many which increased the exemptions of property from taxation.

These efforts are first found in the Laws of 1889, chapter 289, but they proved abortive. However, as a result of the investigations and recommendations accomplished by chapter 15 of the Laws of 1892 the long deferred general revision came about on June 5, 1896 (Laws of 1896, chap. 908). In the Commissioners' report to the Legislature which preceded this last enactment they said that they had " gone over the entire field of statutory law relating to taxation; " that they had intended to effect no radical changes although compelled to make various alterations in order to " eliminate inconsistencies and reduce the subject to a harmonious and systematic whole." (See *Pratt Institute* v. *City of New York*, 183 N. Y. 151, at pp. 155, 156.) This act was early held to have swept aside either by express or implied repeal all special acts exempting the property of such corporations and associations as were brought within the purview of the classification enumerated in the new general statute, viz., the Tax Law of 1896. (*Matter of Huntington*, 168 N. Y. 399; *Pratt Institute* v. *City of New York, supra.*) But relator's private statute of 1871 (*supra*) was not thereby expressly repealed, nor was any property of fraternal corporations contained within the purview of that enactment. Yet, notwithstanding this noninclusion, relator's exemption was continued for the next seven years. During those years all those in authority gave this exemption under the sanction of the private act of 1871 or else they gave this gratuity illegally. I cannot accept the latter alternative. To do so would, in effect, at this late date, charge knavery or incompetence to many high officials who can never make answer to this charge, and when they evidently acted under a statute saved out of a long list of 153 of those expressly repealed and evidently thus considered saved because of the legislative recognition of the obligation of a compact.

We now turn to the enactment of 1903 (*supra*) which amended the General Tax Law by adding to the list of tax exemptions certain real estate by *any* fraternal corporation. Did this act impliedly repeal. the aforesaid act of 1871? Comes here the question as to whether the earlier act was " one of grace or voluntary concession." True, when enacted, relator had, although only recently before, purchased the land upon which it was to initiate and carry out the purpose of its creation, but its heavy investment in building had not been made. By the act of 1873 (*supra*) relator's powers were enlarged by permission to rent portions of its contemplated building, not needed for one of its prime objects, for mercantile purposes, and by the express wording of that act we find that the building which had been made tax exempt by the act of 1871, was then " being erected." The 1871 act made no limitation as to the use

of relator's property provided only that the income therefrom was devoted to its specific charity. Under its charter, however, this power as to the other direct use of its property was lacking. Thus the enlargement of power simply complemented *corporate power as to use of property* with the granted exemption which in turn was limited only by the application of income. The State by this act of 1873 simply gave relator further *corporate* power to practice its charity, continuing the exemption so long as all income derived from the enlarged power was devoted to such purpose.

A bargain may be arrived at in various ways. It is noteworthy that relator's purpose and program in charity and benevolence was of direct and positive financial benefit to the State. The latter had given tax immunity as a consideration therefor. Three years later and while relator was engaged in erecting the very building which it had designed as the "touchstone" of its ability to make that consideration effective and of value to the State, the latter gave the additional corporate power for the greater functioning of relator's charitable purposes. All this seems clear and, being so, it follows that the relator kept its part of the compact by the completion of the building which it accommodated to the enlarged power which had been to more fully effectuate relator's declared purposes and objects. That agreement held and was performed by both parties concerned down to the enactment of 1903. In my opinion we thus have here as clear a case of a compact as is disclosed in the adjudicated cases, and one which is clearly distinguishable from a mere act of grace or voluntary concession.

The enactment of 1903, as we have seen, was unique in the field of the State's general law. It proclaimed a new State policy. For the first time " any " fraternal corporation was given a tax exemption upon certain prescribed conditions. What was this act then, as to relator, but a continuance of the old agreement? Its very phraseology has a familiar ring and tone to one acquainted with the history of the relations between the State and the relator as they had existed for the previous thirty-two years. It is like meeting an old friend in the dark. It seems a fair and reasonable comment to state that it must have been apparent to the Legislature in 1903 that a better policy was to offer the opportunity of the State's compact with relator to " any " fraternal corporation that might choose to accept its conditions. That opportunity the present statute still affords to any fraternal corporation which meets the following three requirements, viz.: 1. It must be organized for the very purpose of building and maintaining a building or buildings for its meeting or meetings of the general assembly of its members

or subordinate bodies and for the accommodation of other fraternal bodies or associations. 2. It must effectuate the foregoing purpose by the acquisition and use of real property and by the use and management thereof, in good faith, obtain a net income. 3. It must then exclusively apply such net income "to build, furnish and maintain an asylum or asylums, a home or homes, a school or schools, for the free education or relief of the members of such fraternity or for the relief, support, and care of worthy and indigent members of the fraternity, their wives, widows or orphans."

I fail to see how these views are at variance with any adjudicated case. As to those relied on by defendants for one or more reasons, there was a failure to comply with one or more of the statutory requirements. As I view it, none of them revoked the claim to exemption when, as here, full compliance was a fact and increment of income for the organized purpose came from rentals to third parties. In *Matter of Syracuse Masonic Temple* (270 N. Y. 8) the income was not *in fact* applied to the requisite purposes. The same was true in *B' Nai B'Rith Club, Inc.*, v. *City of New York* (270 N. Y. 12). In *People ex rel. Mizpah Lodge* v. *Burke* (228 N. Y. 245) relator's primary and inherent purpose of organization was deficient in that it was not "created to build and maintain a building or buildings for its meetings," but rather merely and only "for the purpose of an Odd Fellows' Lodge." In *People ex rel. N. Y. Lodge No. 1* v. *Purdy* (179 App. Div. 805; affd., 224 N. Y. 710) the corporate purpose as the use of the building sought to be exempted was not the same as the more limited purpose provided for by the statute as a place for the meeting or meetings of the general assembly of its members, etc.; and, as in the two cases last cited, there was a failure of the requirement as to application of income. The same is true in *People ex rel. Masonic Hall Assn.* v. *White* (218 App. Div. 38; affd., 244 N. Y. 564). In *People ex rel. Schenectady O. F. T. A.* v. *McMillan* (117 Misc. 600) exemption was denied because the entire net income was not exclusively applied for the purposes enumerated in the statute. In *People ex rel. Perry Lodge* v. *Clark* (125 Misc. 618) and in *People ex rel. Perry Temple Assn.* v. *Clark* (Id. 625), and in *People ex rel. Silver Lake Mutual Assn.* v. *Clark* (Id. 622), relator was not organized exclusively for one of the required purposes. In *People ex rel. German Masonic Temple Assn.* v. *Goldfogle* (136 Misc. 100; affd., 229 App. Div. 863; affd., 225 N. Y. 586) no part of the building sought to be exempt was occupied for the direct and individual purpose of relator. In this case it is stated (136 Misc. at p. 104) that it is "the universal rule that the use of the premises is the controlling element in determining the right to an exemption from

taxation." An analysis of the present statutory requirements as regards the property of fraternal corporations discloses that one direct use of the premises must be as a meeting place for the general assembly of its members or subordinate bodies, etc., and that it produce a net income which in turn shall be exclusively applied or used for the particular and definite kind and character of charity and benevolence as there expressed.

The forepart of the present statute now, as originally, requires that those corporations or associations there named must, to secure tax exemption, use their real estate " *exclusively for carrying out thereupon one or more* " of their purposes which are expressly stated in the first sentence of the subdivision. (Tax Law, § 4, subd. 6.) No mention is there made of *any* exemption as to any fraternal corporation. None was ever there so stated in the whole succession of those enactments from their beginning to date. As we have seen, it was not until 1903 that a fraternal corporation of a certain particular and peculiar kind and character was given an exemption, and one condition expressly stated and which in themselves are also peculiar or unique in the field of social welfare and fraternal intercourse. This enactment then took its present place and language in the subdivision which was first No. 7, now No. 6. It did not then (1903) join the earlier classification nor does it belong there now. It is placed separately, prefaced " and further provided " and is rendered conspicuous by the absence of the requirement that in order to be exempt from taxation its realty must be " exclusively " used for carrying out " *thereupon* " the purpose of the owner. As I understand it the defendants advance their contention under the present statute somewhat by the aid of grammatical construction and punctuation. True, the provision with reference to fraternal corporations added by the said enactment of 1903 was then as now only set off from the rest of the section by commas. A comma precedes and one imediately follows the text, although originally the new provision ended the sentence. But the said act of 1871 and the said amendment of 1903 were to some extent at least *in pari materia.* Therefore, the latter act must be construed with reference to the earlier one. (See McKinney's Cons. Laws, book 1, *supra,* § 68 and cases there cited, wherein it is stated that " It is incumbent on the court, in searching for the proper interpretation of an enactment, to refer to the prior state of the law upon the matter. * * * If the earlier statute is merged in the latter, * * * a mere change of phraseology in the later will not change the previous law, unless the new wording indicates an intention to change the old rule.") It is a well-known rule that incorrect grammar must yield to the legislative intent (*People* v.

*Gates*, 56 N. Y. 387), and that punctuation is subordinate to the text and never allowed to control the plain meaning of the act. (*Butterfield* v. *Rudde*, 58 N. Y. 489.) Also, that in construing a statute the courts will not hesitate to change one mark of punctuation for another if it better represents the manifest legislative intent. (*Matter of Olmsted*, 17 Abb. N. C. 321. See, generally, McKinney's Cons. Laws, book 1, *supra*, § 102, and cases there cited.) Bearing in mind then that the first enumeration of the subdivision makes no mention whatever of fraternal corporations, that the following long context has only reference to this earlier classification wherein partial exemptions and certain exceptions are made and provided for, I think it must be held that the 1903 injection of this wholly new matter into this long subdivision was intended to stand there as free from dependence upon or qualification by the preceding language as its context was new and distinct therefrom. Had the Legislature intended otherwise it seems manifest that it would have so stated or else have grammatically joined the new enactment to the earlier classification in far different manner. But had it done so the old act of 1871 (*supra*) would, in my opinion, have then survived; and had it expressly repealed that act a violation of the old compact would have ensued.

For many reasons a special act of tax exemption to a particular fraternity might prove offensive in a democracy. A convenient and practical method of solving the problem was to enact a new policy into the general law. This would avoid charges of favoritism and at the same time enable the State to keep its faith with relator — its compact there intact. This is my conclusion as to the legislative intent in the 1903 enactment. I know of no other way to explain its location in the subdivision, its unique and peculiar phraseology as applied to fraternal corporations or its remarkable coincidence with the language of relator's purposes as stated in its charter. Thus, while, in my opinion, the act of 1903 did impliedly repeal the said act of 1871, it did so by re-enacting it in new language as a general law, which still survives in the present statute.

In my opinion relator's claim to exemption should be allowed, the assessment of its property under review canceled and the tax thereon vacated and set aside.

Settle decision on notice.