BLITZ ET UX. *v.* BELVEDERE CONVALESCENT AND NURSING HOME, INC.

[No. 236, September Term, 1957.]

*Decided June 13, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Howard Fine,* with whom was *Robert R. Cohen* on the brief, for appellants.

*Robert Hammerman,* with whom were *Gordon, Feinblatt & Rothman* on the brief, for appellee.

BRUNE, C. J., delivered the opinion of the Court.

The appellants-plaintiffs are the owners of an unimproved lot in a development known as Avondale Park in the City of Baltimore and the appellee-defendant is the owner of fourteen other unimproved lots in the same development. The area is in the vicinity of the new Sinai Medical Center now under construction and of Levindale, which is a home for the aged accommodating two hundred and thirty-five patients. There is another home for the aged in the neighborhood, housing over two hundred patients at a time. The appellee proposes to construct a convalescent and nursing home on land owned by it in Avondale Park. The appellants claim that this would constitute a violation of building restrictions imposed upon the lots owned by the appellants and by the appellee, and

brought this suit for an injunction to prevent the construction of the proposed convalescent and nursing home. The case was submitted on a stipulation and supplemental stipulation of agreed facts; and after a hearing, the bill of complaint was dismissed.

The restriction claimed to be violated by the construction of a convalescent and nursing home is a restriction against the use or occupancy of a lot, or of any part thereof as an "asylum." The sole question is whether or not this covenant prevents the construction, operation and maintenance of a convalescent and nursing home. No zoning question is presented, and it is agreed that all of the lots in question are subject to the restriction against asylums. The case turns on whether or not a convalescent and nursing home constitutes an asylum within the meaning of the Avondale Park restrictions.

Those restrictions were first adopted and applied in 1919 and prohibit the use or occupancy of land subject thereto "for the manufacture, brewing or distilling of spirituous, intoxicating or malt liquors, drinking saloon, asylum, bone boiling establishment, tannery or slaughter house or for the manufacture of glue, soap, candles, fertilizers, starch, gunpowder or for any other offensive or dangerous purpose or for the keeping of pigs or other animals of offensive character."

The stipulated facts show that the proposed convalescent and nursing home is to be designed and landscaped in conformity with buildings nearby. They also show: that the home is to accommodate approximately one hundred persons who are in need of temporary nursing care and convalescence primarily of a post-operative nature; that the majority of the patients will return to their homes after a convalescing period and that many will return to their normal pursuits; that the patients at the home will be well advanced in their stage of recovery; that none will be mentally defective, insane, deranged, a nuisance or an alcoholic; and that if any patient should become acutely ill, physically or mentally, he would be removed to some other place at which proper medical facilities would be available.

The evident purpose of the Avondale Park restrictions was

to prevent the use of land for purposes which would be offensive in a residential neighborhood, and the words used should be construed in the light of that purpose. *Himmel v. Hendler,* 161 Md. 181, 155 A. 316. Covenants limiting the free use of land are to be strictly construed. See *Saratoga Bldg. & Land Corp. v. Roland Park Apt. Stables Co.,* 146 Md. 152, 128 A. 270; *Bartell v. Senger,* 160 Md. 685, 155 A. 174; *Yorkway Apts. v. Dundalk Co.,* 180 Md. 647, 26 A. 2d 398; and *Millison v. Fruchtman,* 214 Md. 515, 136 A. 2d 240 (to cite only a few authorities).

Applying these rules to the facts of this case, we have no difficulty in reaching the conclusion that the use of the appellee's land for a convalescent and nursing home here proposed does not violate the covenant against its being used for an "asylum." An interesting historical discussion of the meaning of "asylum" will be found in *State ex rel. Davis v. Bacon,* 6 Neb. 286. Quite obviously the term was not used in the Avondale Park deeds as signifying a place of refuge in which persons accused of crime or debtors might find shelter or sanctuary from arrest. We think that it should be interpreted in accordance with its ordinary or popular meaning *(Himmel v. Hendler, supra), Cronie's Heirs v. Louisville Orphans' Home Society,* 66 Ky. 365; and that this is a retreat, shelter or institution for the protection or relief of the unfortunate, destitute or afflicted. See *Lawrence v. Leidigh,* 58 Kan. 594, 50 P. 600; *Hale v. Stimson,* 198 Mo. 134, 95 S. W. 885; *Curtis v. Allen,* 43 Neb. 184, 61 N. W. 568; *People v. Miller,* 164 Misc. 726, 1 N. Y. S. 2d 267; *Merrill v. Shearston,* 73 Col. 230, 214 P. 540; *Sargent v. Bd. of Education,* 79 N. Y. S. 127. The term has been frequently applied to almshouses or similar institutions (as under statutes referring to "any almshouse or other asylum", as in *Silvey v. Lindsay,* 107 N. Y. 55, 13 N. E. 444; *Wolcott v. Holcomb,* 97 Mich. 361, 56 N. W. 837; *Powell v. Spackman,* 7 Idaho 692, 65 P. 503), orphan asylums and institutions for the afflicted such as those for the insane or for the blind, deaf or dumb, as dictionary definitions show. Among those of the period shortly before the adoption of the restrictions here involved, see the Century Dictionary and Cyclopedia (1913),

Webster's New International Dictionary (1913) and the Oxford English Dictionary (1905). See also 7 *C. J. S., Asylums,* Sec. 1, p. 141, and 26 *Am. Jur., Hospitals and Asylums,* § 2, p. 588.

Reading the word "asylum" in the context of the entire use and occupancy restriction clause of the Avondale Park deeds, we note that it carries the thought that the prohibitory uses are objectionable in a residential neighborhood. Most of them are objectionable to the senses—notably the sense of smell—but some must have been deemed objectionable on other grounds. Asylums for the insane might be deemed objectionable on any of several grounds—sight, sounds or mentally depressing effect. The latter objection might be raised as to other institutions usually thought of as asylums in popular usage. We are not called upon to determine the precise limits of the term "asylum" as used in the restrictions before us or the justness of regarding an asylum of any particular type as objectionable. In this case we see nothing in the convalescent and nursing home as planned by the appellee which would be in conflict with the general purposes of the Avondale Park restrictions.

We think that the word "asylum" is used in those restrictions in its popular sense, and that the patients to be cared for in the proposed home will not be of the kinds of unfortunate persons usually cared for in institutions known as asylums. Consequently, in our judgment, a convalescent and nursing home such as the appellee proposes to construct and operate is not an "asylum" within the commonly accepted meaning of that word, and is not barred by the restrictions before us.

*Decree affirmed, with costs.*